**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Iris Collette JACKSON; Dwight Dean
Jackson, Defendants–Appellants.**

Nos. 98–6487, 99–6090.

United States Court of Appeals,
Tenth Circuit.

June 2, 2000.

M. Jay Farber (Patrick M. Ryan, United States Attorney, with him on the briefs; Sue Tuck Richmond, Assistant United States Attorney, with him on the brief in Case No. 98–6487; Joe Heaton, Assistant United States Attorney, with him on the brief in Case No. 99–6090), Assistant United States Attorney, Oklahoma, for Plaintiff–Appellee.

Joseph L. Wells, Oklahoma City, Oklahoma, for Defendant–Appellant Iris Collette Jackson.

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant–Appellant Dwight Dean Jackson.

Before BALDOCK, McKAY and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Iris Collette Jackson and Dwight Dean Jackson appeal their convictions arising from a crack cocaine distribution endeavor based in Elk City, Oklahoma. Ms. Jackson raises six issues on appeal and Mr. Jackson raises three. After a thorough study of their arguments on appeal, we determine none have merit, and affirm.

## I. Background

Local and federal law enforcement officials began investigating the distribution of crack cocaine in Elk City in 1997. As part of this investigation, agents of the Federal Bureau of Investigation (FBI) and the Elk City Police Department decided to set up video surveillance at two residences they suspected were at the center of a crack distribution system. Agents had identified numerous individuals and two dominant organizations—the Wilson and the Jackson organizations—as being responsible for approximately ninety-five percent of the sale, transportation and distribution of crack cocaine in the Elk City area. The agents suspected the two organizations had loose ties to one another and utilized the same local individuals to distribute the crack cocaine. The FBI installed video cameras on the tops of telephone poles overlooking the residences of Ms. Jackson and Regina Evans—the suspected leaders of the organizations. Although both of these cameras could be adjusted by officers at the police station, and could zoom in close enough to read a license plate, neither had the capacity to record sound, and neither could view the inside of the houses. The officers also utilized a "video car" equipped with three hidden cameras, two VCRs and a transmitter that allowed officers to record and listen to conversations in and around the car as they were occurring.

During their investigation, the FBI enlisted the help of Gina Bromlow as an informant. The Elk City Police were holding Ms. Bromlow after her arrest on charges of possession of cocaine. The Elk City Police contacted FBI Agent Nicholas Manns after Ms. Bromlow expressed her desire to talk to the FBI about her knowledge of the drug distribution network in Elk City. Ms. Bromlow agreed to assist in the investigation by making controlled buys of crack cocaine for the FBI and to record her conversations with the dealers. In exchange for her assistance, Agent Manns promised to call the district attorney in Texas, where Ms. Bromlow also faced charges, and tell the district attorney Ms. Bromlow had been helpful to their investigation. Investigators paid Ms. Bromlow for her assistance and reimbursed her for the expenses she incurred in connection with the investigation.

On November 17, 1997, Ms. Bromlow purchased crack cocaine from Defendant Dwight Jackson, Ms. Jackson's uncle. During this transaction, which was recorded, Mr. Jackson told Ms. Bromlow, "Iris will hook you up." Mr. Jackson also stated, "Iris, she got quarters," meaning Ms. Jackson would sell a quarter ounce of crack or an amount valued at $250.00. Because Mr. Jackson did not have the crack cocaine when Ms. Bromlow inquired about making the purchase, Mr. Jackson and his girlfriend, Sheree Warren, went to Ms. Jackson's house to get the crack. When they returned, Ms. Bromlow bought an amount of crack worth $100.00.

Later that day, FBI agents gave Ms. Bromlow $300.00 and directed her to pick up Regina Evans and to buy crack from Vicky Edmondson or Ms. Jackson. Ms. Bromlow picked up Ms. Evans and drove to Ms. Jackson's house in the FBI "video car." After speaking to Ms. Bromlow for a short while, Ms. Evans left the car and entered Ms. Jackson's house to obtain crack cocaine. Ms. Evans returned with $300.00 worth of crack and gave it to Ms. Bromlow. Ms. Evans explained Ms. Jackson was not at home, but "Old Boy" had given her the crack, referring to Ms. Jackson's father. The FBI recorded the con-

versation between Ms. Bromlow and Ms. Evans.

The next controlled buy took place in early December 1997, when Agent Manns gave Ms. Bromlow $100.00 and directed her to purchase crack cocaine from Mr. Jackson and/or Ms. Warren. The FBI captured this transaction on video tape. The tape showed Ms. Bromlow acquiring the drugs from Mr. Jackson and Ms. Warren. During this transaction, Mr. Jackson told Ms. Bromlow he and Ms. Warren made a lot of money for Ms. Jackson by selling crack for her.

One week later, on December 12, 1997, Ms. Bromlow made another controlled purchase of crack cocaine from Ms. Jackson and Leonard Jackson, Dwight Jackson's brother and Ms. Jackson's uncle. Agent Manns gave Ms. Bromlow $320.00 for this transaction. Ms. Bromlow drove to Ms. Jackson's house where Ms. Jackson asked Ms. Bromlow if she was working for the police. Ms. Bromlow denied working for the police and explained she wanted $300.00 worth of crack and the extra $20.00 was in payment for a previous transaction. Ms. Bromlow gave Leonard Jackson the $320.00. Ms. Jackson retrieved the crack from her bedroom and handed it to Leonard, who then gave it to Ms. Bromlow. Ms. Bromlow asked Ms. Jackson if she would have more crack cocaine later, and Ms. Jackson indicated she would.

On December 17, 1997, Ms. Bromlow made another controlled buy. Although there is no video tape of this transaction because the equipment malfunctioned, Ms. Bromlow testified at trial she went to Ms. Jackson's house and saw Leonard Jackson on the front porch. Ms. Bromlow stated she and Leonard walked into Ms. Jackson's house, she gave Leonard $300.00, and Leonard went into the back bedroom. Ms. Bromlow could hear Leonard tell Ms. Jackson she wanted $300.00 worth of crack. Ms. Bromlow heard Ms. Jackson say she had the crack. A few minutes later, Leonard returned and handed Ms. Bromlow $300.00 worth of crack cocaine.

On January 27, 1998, Ms. Bromlow purchased another $300.00 worth of crack cocaine under the direction of the FBI. The video camera installed in the car revealed Mr. Jackson sitting in Ms. Jackson's car talking to Ms. Bromlow. Mr. Jackson directed Ms. Bromlow to go to Ms. Jackson's house. When they arrived at Ms. Jackson's house, Ms. Bromlow insisted upon being served before Mr. Jackson because she had more money to spend on crack than did Mr. Jackson. (*Id.* at 311.) Mr. Jackson wanted to buy only $10.00 worth of crack cocaine from Ms. Jackson. Ms. Jackson went into her bedroom and then returned to the living area with the crack and handed it to Ms. Bromlow. Ms. Bromlow handed the cash to Ms. Jackson.

On February 10, 1998, the FBI instructed Ms. Bromlow to contact Ms. Jackson and discuss the price of one ounce of crack. After Ms. Bromlow reported to Agent Manns concerning her conversation with Ms. Jackson, he gave her $900.00 with which to purchase crack. Ms. Bromlow returned to Ms. Jackson's residence with the $900.00, and discussed purchasing one ounce of crack cocaine from Ms. Jackson. However, Ms. Jackson did not have a full ounce at that time, so she asked Ms. Bromlow to return later. Mr. Jackson was present during these negotiations. When Ms. Bromlow returned later that day, Ms. Jackson was not present, but she discussed the purchase with Mr. Jackson, who urged her to buy the one ounce from Ms. Jackson or himself. Mr. Jackson claimed to be "hold[ing] down the fort" while Ms. Jackson was out.

That same day, Ms. Jackson, Judy Wiseman, Nequita Hicks, and Wanitha Randall were at Ms. Jackson's house. Ms. Jackson received a page, left the house, and returned a short while later. Shortly thereafter, Ms. Jackson said "Let's go" to the group, and they got into Ms. Jackson's car. Ms. Jackson drove to Hobart, Oklahoma, where she stopped at a store, then pulled

over to the side of the road, parked, and asked Ms. Wiseman to remove a large sum of money from the glove compartment. After Ms. Wiseman gave her the money, Ms. Jackson got out of the car and walked to a vehicle driven by Charles Perry, who had stopped behind them. When she returned to her car, Ms. Jackson had a large amount of crack cocaine, but no longer had the money. Ms. Jackson examined the crack and gave it to Ms. Wiseman to cut in half. Ms. Jackson then put the crack between her legs.

Upon their return to Elk City, Officer Joey Bales of the Elk City Police Department stopped the car. Officer Bales had received a tip from an anonymous caller who told him Ms. Jackson was bringing back a large amount of crack cocaine from Lawton, Oklahoma. Before she stopped the car, Ms. Jackson gave Ms. Wiseman half the crack and told her to hide it. Ms. Wiseman put the crack between her legs. Ms. Jackson hid her half of the crack by inserting it into her vagina. Officer Bales interviewed each of the women separately. Ms. Jackson told Officer Bales she had been to Clinton, Oklahoma, to play bingo. Ms. Wiseman told Officer Bales they had been driving through the towns of Holbert, Clinton, and Cordell. While talking to Ms. Wiseman, Officer Bales noticed Ms. Jackson turning around in the car to talk to the passengers in the back. Ms. Hicks and Ms. Randall told Officer Bales they had been playing bingo. Officer Bales called for assistance, and when other officers arrived, they conducted a dog sniff of the vehicle. The dog alerted to the ashtray which contained $275.00 in cash. The dog also alerted to two purses, one in the front seat and one in the back seat of the car. Officer Bales found a used crack pipe in one of the purses. Officer Bales then took the occupants of the car to the Elk City police station, where Agent Manns was waiting. Because he knew Ms. Bromlow had negotiated the purchase of one ounce of crack from Ms. Jackson, Agent Manns expected Ms. Jackson to return to Elk City with the ounce of crack cocaine. Pri-

or to being strip searched at the station, Ms. Wiseman pulled out the crack she had hidden between her legs and claimed it was hers. When Ms. Jackson was asked to consent to a search of her person, she stated "you might find something and you might not." No drugs were found during the search. However, the officers did not conduct a body cavity search. The officers released Ms. Jackson after the search, and she later bragged about her method of concealing the drugs from the police.

The next day, as Ms. Bromlow was driving in Elk City, she encountered Ms. Jackson, who was in her vehicle along with Mr. Jackson and a person known to Ms. Bromlow only as "Anita." Ms. Jackson accused Ms. Bromlow of "setting her up" and being responsible for the stop that occurred the night before. Ms. Bromlow denied any involvement. Ms. Jackson claimed Regina Evans told Ms. Jackson that Ms. Bromlow knew about the stop. Ms. Bromlow denied this and suggested they go ask Ms. Evans about it. Ms. Jackson then told Ms. Bromlow to follow her to Ms. Evans' residence, and that Mr. Jackson would ride with Ms. Bromlow. When Ms. Bromlow arrived at Ms. Evans' residence, Ms. Evans was in a back room, but would not come out to speak to Ms. Bromlow. Ms. Bromlow, Mr. Jackson and Ms. Jackson then went to Ms. Jackson's house. Mr. Jackson once again rode with Ms. Bromlow. Ms. Bromlow was scared and felt she could not leave. Ms. Jackson told Ms. Bromlow to strip so that she could see if Ms. Bromlow was wearing a wire. Mr. Jackson left the room while Ms. Bromlow was being searched. After finding no evidence of a wire, Ms. Jackson allowed Ms. Bromlow to get dressed. Ms. Jackson told Ms. Bromlow that if she had "set her up," Ms. Bromlow would not live to see the next day.

On May 6, 1998, a search of Ms. Jackson's residence, conducted pursuant to a warrant, revealed an address book bearing Ms. Jackson's name. The address book

contained the names of Judy Wiseman and Maxine Johnson. Officers also found portions of an address book in a purse in the bedroom. These pages contained the names of Charles Perry and Judy Wiseman. During the search, police also found a police scanner in Ms. Jackson's kitchen, and a money transfer order listing Charles Perry as payee in a briefcase in Ms. Jackson's bedroom closet. However, no illegal drugs were found.

On the same day, officers executed a search warrant on Charles Perry's apartment in Lawton, Oklahoma. The search revealed a dinner plate covered with a white powdery substance, two razor blades lying on the plate, and a telephone address book containing Ms. Jackson's name and her phone numbers. Officers arrested Ms. Jackson and Mr. Jackson for their participation in the distribution of the crack cocaine. The investigation ultimately resulted in seventy-two controlled buys of crack cocaine, and the arrest of thirty-four people in addition to the two Jacksons.

Ms. Jackson and Mr. Jackson were tried together. A jury convicted Ms. Jackson of the following six counts on a multi-count indictment: Count 1, a violation of 21 U.S.C. § 846 (conspiracy to distribute cocaine base); Count 2, a violation of 21 U.S.C. § 856 (maintaining a place for the distribution and use of a controlled substance), and 18 U.S.C. § 2 (aiding and abetting); Counts 5 and 7, violations of 21 U.S.C. § 841(a)(1) (distribution of cocaine base) and 18 U.S.C. § 2 (aiding and abetting); Count 8, a violation of 21 U.S.C. § 841(a)(1) (distribution of cocaine base); and Count 9, a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute cocaine base). The district court sentenced Ms. Jackson to terms of imprisonment of 360 months on Counts 1, 5, 7, 8 & 9, and 240 months on Count 2, all to run concurrently.

Mr. Jackson was charged in five counts of the indictment. The jury found Mr. Jackson guilty on the following counts: Count 1, a violation of 21 U.S.C. § 846

(conspiracy to distribute cocaine base); Count 3, a violation of 21 U.S.C. § 841(a)(1) (distribution of cocaine base); Count 4, a violation of 21 U.S.C. § 841(a)(1) (distribution of cocaine base) and 18 U.S.C. § 2 (aiding and abetting); and Count 9, a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute cocaine base) and 18 U.S.C. § 2 (aiding and abetting).The jury found Mr. Jackson not guilty on Count 2, a violation of 21 U.S.C. § 856 (maintaining a place for the distribution and use of a controlled substance), and 18 U.S.C. § 2 (aiding and abetting). *Id.* After hearing contested sentencing issues, the district court sentenced Mr. Jackson to a total of 262 months in prison.

We exercise jurisdiction based on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and affirm all the judgments of the district court in both cases.

## II. Ms. Jackson's Appeal

Ms. Jackson asserts the trial court erred by: 1) denying her motion to suppress evidence obtained through audio and video surveillance; 2) denying her motion in limine to suppress the testimony given by Ms. Bromlow; 3) denying her motion for judgment of acquittal based on insufficiency of the evidence to sustain a conviction; 4) overruling her objections to the presentence report regarding the drug amounts and her leadership role; 5) denying her motion for a special verdict form; and 6) denying her motion to suppress Ms. Bromlow's testimony because it was unlawfully induced in violation of 18 U.S.C. § 201(c)(2).

### A. The Motion to Suppress Information Obtained Through Video and Audio Surveillance

Ms. Jackson first contends the district court erred by denying her motion to suppress the information obtained through the video cameras installed on the telephone poles outside her residence and Ms. Evans'

house, and the information obtained through the video and audio recording devices installed in the FBI "video car." Ms. Jackson argues the video tape recordings and audio recordings were made in violation of Title I of the Electronic Communication Privacy Act of 1986 (Title I), codified at 18 U.S.C. §§ 2510–22,[1] and the Fourth Amendment to the United States Constitution.

■ We review the district court's factual findings supporting its denial of Ms. Jackson's motion to suppress for clear error, viewing the evidence in the light most favorable to the government. *See United States v. Lambert*, 46 F.3d 1064, 1067 (10th Cir.1995). However, we review *de novo* the district court's conclusions as to the ultimate reasonableness of a search or seizure. *Id.*

■ Title I prohibits the intentional interception, eavesdropping to intercept, or procurement of any other person to intercept or endeavor to intercept "any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Although Ms. Jackson seems to have abandoned the argument that Title I applies to silent video surveillance, we note the district court was correct in concluding Title I does not regulate this activity.[2] *See* 18 U.S.C. § 2510. However, the use of silent video surveillance must still comply with the Fourth Amendment. *See Mesa–Rincon*, 911 F.2d

at 1438. *See also Koyomejian*, 970 F.2d at 541–42.

■ Ms. Jackson states the use of the video cameras installed on the telephone poles violated the Fourth Amendment because they were installed without a warrant. The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Whether Ms. Jackson can claim the FBI violated her Fourth Amendment rights by using these video cameras to observe the activity occurring outside the houses depends on whether Ms. Jackson had a reasonable expectation of privacy in the area viewed by the cameras. *See United States v. Gordon*, 168 F.3d 1222, 1225–26 (10th Cir.), *cert. denied*, 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999) (quoting *Minnesota v. Carter*, 525 U.S. 83, 87, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)). *See also Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ The use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (holding the use of aerial photography did not violate defendant's reasonable expectations of privacy); *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (holding aerial observation of a fenced-in back yard within the curtilage of a home

---

**1.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212, was amended and retitled by Title I of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1851 (Title I). *See United States v. Koyomejian*, 970 F.2d 536, 539 n. 1 (9th Cir.) (en banc), *cert. denied*, 506 U.S. 1005, 113 S.Ct. 617, 121 L.Ed.2d 550 (1992).

**2.** Although we did not directly address this issue, in *United States v. Mesa–Rincon*, 911 F.2d 1433 (10th Cir.1990), *holding modified on other grounds*, *United States v. Castillo-Garcia*, 117 F.3d 1179, 1186–87 (10th Cir.), *cert. denied*, 522 U.S. 962, 522 U.S. 974, 118 S.Ct. 395, 118 S.Ct. 428, 139 L.Ed.2d 309, 139 L.Ed.2d 328 (1997), we discussed the

requirements for granting a warrant to install a video camera inside a building, and noted that Title I does not prohibit video surveillance, although it provides guidelines for establishing video surveillance under the Fourth Amendment. *Id.* at 1437–38. Furthermore, the other circuits that have addressed this issue have also determined Title I does not regulate silent video surveillance. *See United States v. Falls*, 34 F.3d 674, 679–80 (8th Cir. 1994); *Koyomejian*, 970 F.2d at 538–41; *United States v. Biasucci*, 786 F.2d 504, 508–09 (2nd Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986); *United States v. Torres*, 751 F.2d 875, 880–81 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

without a warrant does not violate the Fourth Amendment and stating: "The Fourth Amendment protection of the home has never extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). In addition, activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection, and thus, is not constitutionally protected from observation. *See Katz*, 389 U.S. at 351, 88 S.Ct. 507 (1967). *See also United States v. Longoria*, 177 F.3d 1179, 1182 (10th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 217, 145 L.Ed.2d 182 (1999). The record of the suppression hearing supports the district court's finding the video cameras installed on the telephone poles were incapable of viewing inside the houses, and were capable of observing only what any passerby would easily have been able to observe. Thus, Ms. Jackson had no reasonable expectation of privacy that was intruded upon by the video cameras. Therefore, we conclude Ms. Jackson's rights under the Fourth Amendment were not implicated, and there was no need for the police officers to obtain a search warrant before installing and utilizing the video cameras.[3]

 Ms. Jackson also contends the district court erred by denying her motion to suppress the evidence gleaned from the use of the audio/video equipment installed in the undercover FBI car. The district court determined the audio recordings made by the audiovisual equipment in the FBI car did not contravene the Fourth Amendment or Title I because evidence at the hearing established Ms. Bromlow consented to the recording of her conversations. While recognizing Title I does not prohibit the use of audio surveillance when one of the participants in the conversation consents to the recording, Ms. Jackson argues there was insufficient evidence to find consent because the evidence presented on the issue was inadmissible hearsay.[4]

 Agent Manns testified Ms. Bromlow gave her consent to record the conversations occurring within the FBI car. Although this is undeniably hearsay evidence as it is defined by Federal Rule of Evidence 801(c), it was not inadmissible hearsay. It is well established that, apart from questions of privilege, the Federal Rules of Evidence do not apply in suppression hearings. *See United States v. Matlock*, 415 U.S. 164, 172–74, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). *See also* Fed.R.Evid. 104(a) (stating the court is not bound by rules of evidence when deciding preliminary matters concerning the admissibility of evidence); Fed.R.Evid. 1101(d)(1) (stating evidence rules are inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104."). Furthermore, we

---

3. Ms. Jackson cites the *Mesa–Rincon* and *Torres* cases in support of her argument. However, these cases are distinguishable. In *Mesa–Rincon* we dealt with the installation of a silent video camera inside a business. 911 F.2d at 1443. The *Torres* court dealt with the installation of a video camera in a private residence. 751 F.2d at 877. These are places where the defendants had a reasonable expectation of privacy. Because the Fourth Amendment was not implicated by the use of the silent video cameras in the present case, the prerequisites for obtaining a warrant to install a video camera based on the requirements of Title I are inapplicable. *Compare Mesa–Rincon*, 911 F.2d at 1436–38.

4. Title I does not apply to recordings of conversations made with the consent of one of the parties. *See* 18 U.S.C. § 2511(2)(c); *United States v. Davis*, 1 F.3d 1014, 1016 (10th Cir.1993) ("Although [the] statute forbids the use of warrantless intercepted telephone conversations in law enforcement investigations, law enforcement personnel may lawfully monitor or record *conversations with the consent of one of the parties* to the conversation."). Furthermore, "[w]hen the government records a defendant's conversation with another party, pursuant to that party's consent, neither the Fourth Amendment nor 18 U.S.C. § 2511(2)(c) is violated." *United States v. McKneely*, 69 F.3d 1067, 1073 (10th Cir.1995). *See also Longoria*, 177 F.3d at 1182–83 (the Fourth Amendment provides no protection for one who discusses illegal activities with an undercover informant).

have held hearsay evidence is admissible at suppression hearings. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). We also note Ms. Jackson did not question the voluntariness of Ms. Bromlow's consent at the suppression hearing, nor did she object to the hearsay statements repeated by Agent Manns at the hearing. There is nothing in the record to indicate Ms. Bromlow's consent was not voluntary. Thus, the government was not required to provide further evidence of Ms. Bromlow's voluntary consent and the district court did not err by denying Ms. Jackson's motion to suppress the recorded conversations. *See McKneely,* 69 F.3d at 1073–74; *see also United States v. Axselle,* 604 F.2d 1330, 1338 (10th Cir.1979).

We conclude the evidence obtained from the video cameras installed on the telephone poles and the recordings made in the undercover FBI car were not introduced in violation of Title I or the Fourth Amendment. We affirm the district court's order denying Ms. Jackson's motion to suppress.

### B. Motion in Limine Concerning Ms. Bromlow's Testimony

■■■ Ms. Jackson contends the district court erred by denying her motion in limine to suppress Ms. Bromlow's testimony. Specifically, Ms. Jackson claims because Ms. Bromlow was paid for her services as a confidential informant,[5] she was an "employee," and as such, the FBI was required to withhold taxes from her pay pursuant to 26 U.S.C. § 3402(a)(1) and Okla. Stat. Ann. tit. 68, § 2385.2. Thus, she argues Ms. Bromlow's testimony should have been suppressed because it was obtained in violation of law when the government did not withhold taxes from her pay. The district court summarily denied the motion, finding it to be without legal authority. We agree.

■■■ Even if the FBI violated Oklahoma and federal tax statutes, the suppression of Ms. Bromlow's testimony was inappropriate under these circumstances. The primary purpose of the exclusionary rule is to deter police misconduct. *See Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The application of the exclusionary rule "has been restricted to those instances where its remedial objectives are thought most efficaciously served" and is only warranted when it will result in "appreciable deterrence" of police misconduct. *Arizona v. Evans,* 514 U.S. 1, 11, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (quotation marks and citations omitted). Accordingly, in order to justify implementing the exclusionary rule, the challenged evidence must in some sense be the product of illegal government conduct. *See Nix,* 467 U.S. at 444, 104 S.Ct. 2501. In the present case, the alleged illegality—the failure to withhold taxes from money paid to Ms. Bromlow— was too far attenuated from the procurement of the evidence against Ms. Jackson to justify application of the exclusionary rule. In fact, we see no connection whatsoever, nor do we believe Ms. Jackson's rights were in any way violated by the alleged illegal conduct. Consequently, any deterrence that would arise from suppressing Ms. Bromlow's testimony would be far outweighed by society's interest in bringing the guilty to justice. *See United*

---

**5.** Of the amount given to Ms. Bromlow in exchange for her services, $1,866.63 was for expenses consisting of rent, pager costs, telephone calling cards "and other expenses accrued during the course of the investigation." The balance of the amount paid Ms. Bromlow was for services rendered in conducting the controlled purchases of crack. Of the funds designated as for "services rendered," $2,000 was used to assist Ms. Bromlow in her relocation from Western Oklahoma. Ms. Bromlow was also paid by the Oklahoma Second District Drug Task Force. The record does not disclose the amount she was paid by the Oklahoma authorities.

*States v. Payner*, 447 U.S. 727, 736 n. 8, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (noting "where the illegal conduct did not violate the respondent's rights, the interest in preserving judicial integrity and in deterring such conduct is outweighed by the societal interest in presenting probative evidence to the trier of fact.") In short, this is not the type of statutory violation that would mandate suppression of Ms. Bromlow's testimony.[6] Thus, we affirm the district court's determination on this issue.

## C. Sufficiency of the Evidence

Ms. Jackson also argues the district court erred by denying her motion for a judgment of acquittal because the evidence was insufficient to sustain her conviction of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846. Specifically, she asserts: 1) the evidence was insufficient to support a finding Ms. Jackson entered into an agreement with others to distribute crack cocaine, and 2) the government failed to introduce evidence that crack cocaine was a type of cocaine base.

 Sufficiency of the evidence to support a jury's verdict is a legal issue that is reviewed *de novo*. *See United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir.1999). On appeal, we "ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the

government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). In conducting this review we "may neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir.1997) (quotation marks and citations omitted). It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence and draw inferences from the facts presented. *See United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir.1995), *cert. denied*, 516 U.S. 1081, 116 S.Ct. 793, 133 L.Ed.2d 742 (1996). When reviewing the denial of a motion for judgment of acquittal based on insufficient evidence, this court conducts the same analysis, reviewing the judgment of the district court *de novo*. *See United States v. Ailsworth*, 138 F.3d 843, 846 (10th Cir.), *cert. denied*, 525 U.S. 896, 119 S.Ct. 221, 142 L.Ed.2d 181 (1998); *United States v. Hooks*, 780 F.2d 1526, 1531 & n. 1 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

It is unclear whether Ms. Jackson is challenging her convictions on all the counts or is only challenging her conviction for the violation of 21 U.S.C. § 846. Nevertheless, after carefully reviewing the record on appeal, we conclude there was ample evidence to support Ms. Jackson's convictions on all the counts. We find her arguments concerning the sufficiency of the evidence to be without merit, and af-

6. We also question whether Ms. Bromlow was even an FBI "employee," and therefore whether the FBI was subject to the provisions of federal and Oklahoma law requiring the withholding of taxes from wages. As a confidential informant, it does not appear Ms. Bromlow was sufficiently under the control of the FBI in order to qualify as an employee under the common law standards incorporated in 26 C.F.R. § 31.3121(d)–1(c) and as implied by the language of Okla. Stat. Ann. tit. 68, § 2385.1. *See also* Rev. Rul. 87–41 (listing twenty factors under the common law rules to consider when determining the nature of the employment relationship and emphasizing the degree of control exerted by the putative employer over the putative employee). Although

Agent Manns directed Ms. Bromlow to make controlled buys and gave her the equipment to do so, there is no evidence in the record to support an assertion Agent Manns specified how these controlled buys were to be performed. *C.f. Slagle v. United States*, 612 F.2d 1157 (9th Cir.1980) (where the plaintiff sued under the Federal Tort Claims Act, 28 U.S.C. § 2671, for injuries he sustained when accompanying a federal drug informant, the court determined the informant was not an employee as defined by the Restatement (Second) of Agency, § 220(2) (1958) and noted "[t]he extent of control over the details of [the informant's] work by [the FBI special agent] was extremely small." *Id.* at 1160–61.)

firm the district court's denial of her motion for a judgment of acquittal.

### D. Sentencing

■ Ms. Jackson next contends the district court erred by failing to sustain her objections to the presentence report. Ms. Jackson objected to the amount of drugs the district court attributed to her and to its finding she was a leader of the drug distribution operation. "We review the district court's factual findings for clear error and its interpretation and application of the sentencing guidelines de novo." *United States v. Gigley*, 207 F.3d 1212, 1221(10th Cir.2000).

### 1. Drug Quantity

■ Ms. Jackson argues the court incorrectly attributed 6,243.86 grams of cocaine base (crack) to her in determining her base offense level of 38. Ms. Jackson contends the court should have only considered 451.59 grams of crack in calculating her base offense level. The balance of the crack attributed to her (5896.8 grams) was based on the testimony of Judy Wiseman. Ms. Jackson states Ms. Wiseman's testimony lacked a "sufficient indicia of reliability to support its probable accuracy" and thus should not have been considered by the district court in its calculation of the quantity of crack attributable to Ms. Jackson.

■ The district court's calculation of drug quantity is a finding of fact that we review for clear error only. *See United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir.1999). "The government must prove the quantities of drugs for sentencing purposes by a preponderance of the evidence, and the evidence relied upon must possess a minimum indicia of reliability." *United States v. Cruz Camacho*, 137 F.3d 1220, 1225 (10th Cir.1998). When the actual drugs underlying a drug quantity determination are not seized, the court may rely upon an estimate to establish the guideline offense level, if the estimate is supported by the facts in the case and "bears suffi-

cient indicia of reliability." *United States v. Ruiz–Castro*, 92 F.3d 1519, 1534 (10th Cir.1996) (quotation marks and citations omitted); USSG § 2D1.1, comment. (n.12). Thus, the defendant may be sentenced based upon the total amount of drugs she "reasonably foresaw or which fell within the scope of [her] particular agreement with the conspirators." *United States v. Ivy*, 83 F.3d 1266, 1289 (10th Cir.) (quotation marks and citations omitted), *cert. denied*, 519 U.S. 901, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996); USSG § 1B1.3(a)(1)(B), comment. (n.2). In making its factual sentencing determinations, the district court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial "so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability." *United States v. Wacker*, 72 F.3d 1453, 1477 (10th Cir.1995) (quotation marks and citations omitted).

■ The thrust of Ms. Jackson's argument is that Ms. Wiseman's testimony lacked credibility simply because she was a coconspirator testifying in the anticipation of leniency. However, the credibility of a witness at sentencing is for the district court to evaluate. *United States v. Sloan*, 65 F.3d 861, 865 (10th Cir.1995), *cert. denied*, 516 U.S. 1097, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996); *United States v. Browning*, 61 F.3d 752, 754–55 (10th Cir. 1995). We defer to the district court's determination of credibility as the district court is in a better position to judge the witness' credibility than are we. We conclude the district court did not err by holding Ms. Jackson accountable for a total of 6243.86 grams of crack cocaine.

### 2. Leadership Role

■ Ms. Jackson next finds fault with the district court's finding she was the leader of a crack distribution ring and by applying a four-level enhancement to

her base offense level pursuant to USSG § 3B1.1(a). We review the district court's determination that Ms. Jackson was a leader or organizer of the drug distribution operation under USSG § 3B1.1(a) for clear error. *See United States v. Tagore*, 158 F.3d 1124, 1130 (10th Cir.1998). The Sentencing Guidelines provide for a four-level increase in the offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). The government bears the burden of proving by a preponderance of the evidence the applicability of this enhancement. *See United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir.), *cert. denied*, 515 U.S. 1152, 516 U.S. 883, 115 S.Ct. 2599, 116 S.Ct. 220, 132 L.Ed.2d 845, 133 L.Ed.2d 150 (1995). Factors the court should consider when determining whether the enhancement applies are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, ... the degree of participation in planning or organizing the offense, ... and the degree of control and authority exercised over others." USSG § 3B1.1(a), comment. (n.4). The guidelines do not require each and every factor to be satisfied in order for the enhancement to be applied. *See United States v. Bernaugh*, 969 F.2d 858, 863 (10th Cir.1992). "[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals." *United States v. Albers*, 93 F.3d 1469, 1488 (10th Cir.1996) (quotation marks and citations omitted).

▮ Ms. Jackson argues there is no evidence in the record to indicate she directed, controlled or organized her cocon-spirators. We find this contention to be without merit. The record is replete with examples of Ms. Jackson exercising control and directing the activities of the cocon-spirators. Furthermore, it is clear Ms. Jackson was not simply a drug dealer engaging in separate transactions, but was at the center of an organized drug distribu-tion operation. The cases cited by Ms. Jackson in support of her argument on this point are distinguishable. Thus, we conclude the district court did not err by increasing Ms. Jackson's base offense by four levels pursuant to USSG § 3B1.1(a).

E. Jury Instructions

▮ Ms. Jackson claims the court erred by denying her motion requesting the submission of a special verdict form to the jury. In the event the jury found her guilty of the drug crimes, Ms. Jackson wanted to require the jury to determine whether the controlled substance was "crack" cocaine or some other form of cocaine, and to determine the quantity of the substance attributable to Ms. Jackson. Because verdict forms are essentially instructions to the jury, our review of a special verdict form is governed by the same abuse of discretion standard we apply to jury instructions. *See Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1249 (10th Cir.1998) (citing *United States v. Reed*, 147 F.3d 1178, 1180–81 (9th Cir. 1998)), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). "We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Cerrato–Reyes*, 176 F.3d 1253, 1262 (10th Cir.1999). Accordingly, "[t]his Court reviews the district court's refusal to submit a requested instruction to the jury for abuse of discretion. A district court does not abuse its discretion so long as the charge as a whole adequately states the law." *United States v. Starnes*, 109 F.3d 648, 650–51 (10th Cir.) (quotation marks and citations omitted), *cert. denied*, 521 U.S. 1128, 117 S.Ct. 2529, 138 L.Ed.2d 1029 (1997). Whether an issue concerned a matter of law for the trial court to determine or a question of fact properly left to the jury's determination, is wholly a question of law over which we exercise *de novo* review. *See United*

*States v. Pena,* 930 F.2d 1486, 1491 (10th Cir.1991).

### 1. The Proposed Verdict Form Requiring the Jury to Determine the Type of Controlled Substance

 Ms. Jackson contends the district court erred by failing to instruct the jury it must determine whether the cocaine base was in the form of cocaine base known as "crack." However, Ms. Jackson admits on appeal that this circuit has recently addressed the issue of whether or not a defendant has a right to a jury determination concerning whether the controlled substance at issue in a § 841(a)(1) conviction is "crack" or some other form of cocaine base. In *United States v. Johnson,* 130 F.3d 1420 (10th Cir.1997), *cert denied,* 525 U.S. 829, 119 S.Ct. 78, 142 L.Ed.2d 61 (1998), we held the distinction between cocaine base and other forms of cocaine is strictly an issue for the court to determine in sentencing a defendant convicted under § 841(a)(1). *Id.* at 1428 (relying on the reasoning of the Fifth Circuit in *United States v. Deisch,* 20 F.3d 139, 151 (5th Cir.1994)). Ms. Jackson invites us to reconsider *Johnson* and hold the jury must determine the nature of the controlled substance. However, a three-judge panel of this court cannot disregard or overrule circuit precedent. *See United States v. Foster,* 104 F.3d 1228, 1229 (10th Cir. 1997). Therefore, Ms. Jackson's argument on this point must fail.

### 2. The Proposed Jury Instruction Regarding the Quantity of the Controlled Substance

 Ms. Jackson also argues the court erred by not allowing the jury to determine the amount of crack attributable to her. Ms. Jackson offers no authority to support her contention that the jury, rather than the sentencing court, should make this determination. We reject Ms. Jackson's argument. This determination has been clearly left to the sentencing court. *See* USSG § 1B1.3 (setting forth the relevant factors which may be used by the sentencing court to determine the guideline range). *See also United States v. Boonphakdee,* 40 F.3d 538, 542 (2d Cir. 1994) (holding 21 U.S.C. § 841(a)(1) does not require proof of a particular amount of narcotics as an element of the offense); *Pena,* 930 F.2d at 1492 (holding factual issues relevant to the degree of punishment are to be decided by the trial court). *Cf. United States v. Frederick,* 897 F.2d 490, 492–93 (10th Cir.) (holding sentencing factors need not be proven to the jury beyond a reasonable doubt), *cert. denied,* 498 U.S. 863, 111 S.Ct. 171, 112 L.Ed.2d 135 (1990). The district court did not err by denying Ms. Jackson's requested jury instructions.

### F. Suppression of the Paid Informant's Testimony

Finally, Ms. Jackson argues the district court erred by failing to suppress the testimony of Ms. Bromlow, the confidential informant, based on our decision in *United States v. Singleton,* 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999) (*"Singleton II "*). Ms. Jackson moved to suppress Ms. Bromlow's testimony based on the first *Singleton* decision, *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), *vacated on hearing en banc,* 165 F.3d 1297 (10th Cir.1999) (*Singleton I* ). She made her motion after this court vacated *Singleton I,* but before we issued our en banc opinion in *Singleton II.* The district court rejected Ms. Jackson's argument, refusing to rely upon *Singleton I.* Although Ms. Jackson recognizes *Singleton I* was vacated, she contends it retains some vitality based on her reading of our opinion in *Singleton II.*

In *Singleton I,* the panel concluded the testimony of a codefendant was introduced in violation of 18 U.S.C. § 201(c)(2), which provides:

Whoever—

directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ...

.　　.　　.　　.　　.

shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). The panel determined the prosecuting attorney had violated 18 U.S.C. § 201(c)(2) by promising the witness leniency in exchange for his testimony. *Singleton I*, 144 F.3d at 1350–51, 1358. The panel concluded the codefendant's testimony should have been suppressed and the failure to do so was not harmless error. *Id.* at 1359–61. The panel accordingly reversed the defendant's conviction and remanded for a new trial. *Id.* at 1361. In *Singleton II*, however, this court sitting en banc held § 201(c)(2) does not apply to the United States or an Assistant United States Attorney functioning within the official scope of office. 165 F.3d at 1298. We concluded the term "whoever" in the statute does not apply to the government when its officials are acting within the scope of traditional practices of the sovereign. *Id.* at 1302 & n. 2. We reasoned in such cases the prosecutor is acting as an "alter ego" of the sovereign and Congress could not have intended to strip the representative of the sovereign of these traditional prerogatives without explicitly stating its intent to do so. *Id.* at 1302.

Ms. Jackson attempts to distinguish the present case from *Singleton II* by asserting Ms. Bromlow was not simply offered leniency but was offered cash payments in exchange for her testimony. She asserts payment for testimony is not a traditional practice of the sovereign, and thus argues Ms. Bromlow's testimony was given in violation of § 201(c)(2). In support of her argument, Ms. Jackson draws our attention to the following language of *Singleton II:*

Our conclusion in no way permits an agent of the government to step beyond the limits of his or her office to make an offer to a witness other than one traditionally exercised by the sovereign. A prosecutor who offers something other than a concession normally granted by the government in exchange for testimony is no longer the alter ego of the sovereign and is divested of the protective mantle of the government. Thus, fears our decision would permit improper use or abuse of prosecutorial authority simply have no foundation. It is noteworthy, then, that defendant's premise relies upon the shibboleth "the government is not above the law." While we agree with that notion, we simply believe this particular statute does not exist for the government.

165 F.3d at 1302. Because this issue requires us to resolve questions of law, our review is de novo. *See Ho v. Greene,* 204 F.3d 1045, 1052 (10th Cir.2000) ("The interpretation of a federal statute is a question of law which this court reviews de novo."); *United States v. Coleman,* 9 F.3d 1480, 1483 (10th Cir.1993) (the determination that a federal statute has been violated based on the court's interpretation of the language contained in that statute is a legal conclusion we review de novo), *cert. denied,* 510 U.S. 1184, 114 S.Ct. 1234, 127 L.Ed.2d 578 (1994).

Although this court made it clear in *Singleton II* that § 201(c)(2) does not apply to government attorneys when they offer leniency in exchange for testimony, we have not addressed whether the bribery statute applies when the government pays a witness for testimony. Other courts that have addressed the *Singleton I* argument have done so in the context of an offer of leniency in exchange for testimony, and have concluded that, under those circumstances, the statute does not exist for the government attorneys. *See, e.g., Unit-*

ed States v. Lara, 181 F.3d 183, 197 (1st. Cir.1999), cert. denied, —— U.S. ——, 120 S.Ct. 432, 145 L.Ed.2d 338 (1999), —— U.S. ——, 120 S.Ct. 842, 145 L.Ed.2d 708 (2000); United States v. Ramsey, 165 F.3d 980, 986–87, 990 (D.C.Cir.), cert. denied, —— U.S. ——, 120 S.Ct. 223, 145 L.Ed.2d 187 (1999); United States v. Haese, 162 F.3d 359, 366 (5th Cir.1998), cert. denied, 526 U.S. 1138, 119 S.Ct. 1795, 143 L.Ed.2d 1022 (1999); United States v. Ware, 161 F.3d 414, 418, 421 (6th Cir. 1998), cert. denied, 526 U.S. 1045, 119 S.Ct. 1348, 143 L.Ed.2d 511 (1999); see also United States v. Bidloff, 82 F.Supp.2d 86, 93–94, 100 (W.D.N.Y.2000). None of our sister circuits has addressed whether outright payment for testimony by the government may be considered a violation of the statute. But see United States v. Medina, 41 F.Supp.2d 38, 51–52 (D.Mass. 1999) (holding there is no tradition of payment of a witness for testimony, and the payment of witnesses could be a violation of § 201(c)(2) depending on the facts).

Although the government urges us to hold our decision in Singleton II foreclosed all arguments concerning a violation of 18 U.S.C. § 201(c)(2) by a government attorney, we did not so hold in Singleton II. As Ms. Jackson points out, we held the statute does not exist for government attorneys when they are exercising traditionally recognized prerogatives of the sovereign, specifically when they offer leniency in exchange for testimony. 165 F.3d at 1302 & n. 2. Government attorneys may come under the auspices of § 201(c)(2) if they "step beyond the limits of [their office] to make an offer to a witness other than one traditionally exercised by the sovereign."

Id. at 1302. This test, as noted by the concurrence, "creates a conceptually messy legal regime for handling the case of the errant United States Attorney 'who offers something other than a concession normally granted by the government.'" Id. at 1307 (Lucero, J., concurring) (quoting majority at 1302). Ms. Jackson's argument brings us squarely into that messy area and raises a number of interesting questions, such as who bears the burden of proof to show the government committed a violation of 18 U.S.C. § 201(c)(2), and whether paying a witness for her testimony may constitute a violation of 18 U.S.C. § 201(c)(2) as a matter of law.

 First, we conclude the defendant bears the burden of showing a prima facie case of a violation of 18 U.S.C. § 201(c)(2). In motions to suppress, the defendant usually bears the burden of proof. See United States v. Madrid, 30 F.3d 1269, 1275 (10th Cir.) ("The proponent of a motion to suppress bears the burden of proof."), cert. denied, cert. denied, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994); United States v. Moore, 22 F.3d 241, 243 (10th Cir.) (same), 513 U.S. 891, 115 S.Ct. 238, 130 L.Ed.2d 161 (1994); United States v. Crocker, 510 F.2d 1129, 1135 (10th Cir.1975) ("It is fundamental that on a motion to suppress there must be a foundation in fact for the legal result. Logic dictates that a pre-trial Motion to Suppress filed by an accused does in fact cast the burden upon the movant to present facts necessary to sustain his position." (Quotation marks and citations omitted.)).[7] We see no reason why the defendant, claiming a violation of 18 U.S.C. § 201(c)(2), should not be re-

---

7. See also United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir.1993) ("We believe that the defendant bears the burden of proving that a legally sufficient basis asserted as a justification for a search or seizure was pretextual."); United States v. One Hundred Forty–Nine Thousand Four Hundred Forty–Two and 43/100 Dollars in U.S. Currency, 965 F.2d 868, 874 (10th Cir.1992) ("[T]he burden is on the movants to demonstrate deliberate falsity or reckless disregard for the truth by the

affiant, supported by an offer of proof."); Axselle, 604 F.2d at 1335 ("The burden of proving that the interception was 'willfully' done [in violation of 18 U.S.C. § 2511(1)(a)] rested on the defendant as the party seeking to suppress the evidence."); United States v. Villano, 529 F.2d 1046, 1058 (10th Cir.) ("The initial burden to show that an unlawful surveillance occurred rested on the defendants."), cert. denied, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976).

quired to demonstrate the alleged actions taken by the prosecution were not those normally exercised by the sovereign and recognized under common law. Thus, the defendant asserting a violation of 18 U.S.C. § 201(c)(2) must make a showing the government promised the witness "something of value" in exchange for the testimony, and that by making such a promise, the government stepped out of the shoes of the sovereign—*i.e.*, the government made a promise of something of value not normally offered and this action was inconsistent with the role of the prosecutor. *See Medina*, 41 F.Supp.2d at 53 (holding the burden shifts to the government after the defendant has made a prima facie showing of a violation of § 201(c)(2)).

In the present case, there is no evidence in the record indicating Ms. Bromlow was paid in exchange for her testimony. Although the parties may have contemplated Ms. Bromlow would testify upon the completion of the investigation, Ms. Jackson has not shown Ms. Bromlow was paid in exchange for her testimony. The record reveals Ms. Bromlow was paid for her investigative services and reimbursed for the expenses she incurred in connection with the investigation prior to trial. Payment for the services of a confidential informant is a long-established practice and cannot constitute a violation of the bribery statute even if the parties contemplated testimony by the paid informant. *See United States v. Persico*, 832 F.2d 705, 717 (2d Cir.1987) (testimony of paid FBI informant was for the jury to evaluate, listing cases and quoting *United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir.1987) (en banc)), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *United States v. Jones*, 575 F.2d 81, 85–86 (6th Cir.1978) (holding it is not necessary to exclude the testimony of an informant paid for information leading to a conviction under a contingency fee arrangement). Consequently, Ms. Jackson has failed to show even a debatable violation of 18 U.S.C. § 201(c)(2). Because we have concluded Ms. Jackson failed to show Ms. Bromlow was paid in exchange for her testimony, we need not decide whether paying a witness for her testimony at trial is an act which brings the prosecutor outside of the role of the sovereign, thus making him or her subject to § 201(c)(2). We do note, however, that in order to make a prima facie showing of a violation of the bribery statute by the government, the defendant must do more than simply insist the exchange was not one traditionally extended by the government, as did Ms. Jackson in this case.[8] Thus, we conclude Ms. Jackson's argument based on *Singleton II* must fail. We affirm all the district court's orders and rulings in Ms. Jackson's case.

---

8. Rather than citing any legal authority to support her argument that the payment of cash for the services of a confidential informant/witness is beyond the scope of traditional prosecutorial practice, Ms. Jackson merely asserts:

> the payment of a witness in cash and other benefits is not the traditional practice of the sovereign as delineated by the en banc court, which specifically addressed the practice of granting leniency in exchange for testimony. Those precepts set forth in both *Singleton* opinions relate only to the trade off of testimony for leniency and do not address the trade off of cash for testimony. As such[,] Appellant would urge that the trial court erred in its application of the *Singleton* opinions to the facts con-

cerning the testimony of the paid confidential informant, Gina Bromlow, and should have suppressed her testimony.

We conclude this statement is insufficient to substantiate a claim of a violation of the bribery statute. Furthermore, there is no reason to read the *Singleton II* opinion as narrowly as Ms. Jackson suggests. As discussed above, the bribery statute does not apply to prosecutors when they are acting as the "alter ego" of the sovereign. Moreover, Ms. Jackson criticizes the district court for its failure to suppress Ms. Bromlow's testimony based on our opinion in *Singleton II*. However, Ms. Jackson did not move for a continuance pending our en banc decision in *Singleton II*, and thus, did not present these arguments before the trial court.

### III. Mr. Jackson's Appeal

Mr. Jackson asserts the following on appeal: 1) the trial court erred by denying his requested jury instructions on diminished capacity and the lesser included offense of simple possession; 2) the evidence was insufficient to support a finding Mr. Jackson had the intent to distribute crack cocaine and possessed with the intent to distribute crack cocaine; and 3) the evidence was insufficient to support the addition of 244 grams of crack cocaine to the sentencing guidelines calculation of drug amounts.

### A. Diminished Capacity/Voluntary Intoxication Instruction

Mr. Jackson requested an instruction that would have allowed the jury to determine he lacked the specific intent to commit the crimes with which he was charged if the jury found Mr. Jackson was under the influence of a controlled substance when he committed the crimes.[9] The district court determined the evidence at trial did not warrant the instruction, and denied Mr. Jackson's request. Mr. Jackson asserts the evidence adduced at trial supported the diminished capacity instruction because it showed he was a crack addict, under the influence of crack cocaine at the time he committed these crimes, and he was so driven by his need to feed his habit he was unable to resist the impulse to obtain crack through whatever means available to him. Mr. Jackson contends he was involved in the distribution of crack

cocaine merely to obtain crack for his personal use, and therefore could not form the specific intent to commit the crimes.[10] Thus, he argues the court should have given his requested instruction for Counts 1, 3, 4 and 9.

▮▮▮▮ Our review of the denial of requested jury instructions is as follows:

We review a district court's decision whether or not to give a particular instruction for an abuse of discretion. However, we conduct a de novo review to determine whether, as a whole, the instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. A defendant is not entitled to an instruction which lacks a reasonable legal and factual basis.

*United States v. Beers,* 189 F.3d 1297, 1300 (10th Cir.1999) (quotation marks and citations omitted), *cert. denied,* — U.S. —, 120 S.Ct. 1696, 146 L.Ed.2d 501 (2000). We have also said: "A criminal defendant is entitled to a theory of defense instruction that is legally justified and supported by sufficient evidence for a jury to find in defendant's favor. We review de novo whether a district court committed reversible error in failing to submit a requested theory of defense instruction." *United States v. Bindley,* 157 F.3d 1235, 1241 (10th Cir.1998) (citations omitted), *cert. denied,* 525 U.S. 1167, 119 S.Ct. 1086, 143 L.Ed.2d 87 (1999). Thus, Mr. Jackson was

---

9. Mr. Jackson requested the following instruction:

> You may consider evidence of the defendant's mental condition in deciding whether the government has proved beyond a reasonable doubt that Dwight Jackson acted with the intent to commit the act charged in the indictment.
>
> Voluntary intoxication and use of controlled substances alone will never provide a legal excuse for the commission of a crime. However, the fact that a person was under the influence of controlled substances at the time of the commission of the crime may negate the existence of a specific intent.

10. The only case Mr. Jackson cites in support of his argument is *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir.1987). (Apt. Br. at 16.) Although in *Soundingsides,* this Court recognized an instruction on diminished capacity may be appropriate where the evidence indicates the defendant was so intoxicated the defendant was incapable of forming the mens rea required by a specific intent crime, 820 F.2d at 1242, we do not find this case particularly helpful to Mr. Jackson's argument. In *Soundingsides,* we determined the court properly instructed the jury that voluntary intoxication was not a defense for the general intent crimes of second degree murder and voluntary manslaughter.

only entitled to the diminished capacity/voluntary intoxication instruction if the law supported his theory and the facts in evidence were sufficient for a jury to find in Mr. Jackson's favor. *See United States v. Martinez*, 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied*, 507 U.S. 1022, 509 U.S. 913, 113 S.Ct. 1824, 113 S.Ct. 3019, 123 L.Ed.2d 454, 125 L.Ed.2d 708 (1993). In examining these issues, we keep in mind "[t]he test for a diminished capacity defense ... is whether the defendant had the mental capacity to form the specific intent to commit the crime at issue." *United States v. Vazquez–Pulido*, 155 F.3d 1213, 1218 n. 8 (10th Cir.), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 356 (1998).

### 1. Counts 1 and 9

■ A defendant is not guilty of a specific intent offense if voluntary intoxication prevented the defendant from forming the specific mens rea required for that crime. *See United States v. Sands*, 968 F.2d 1058, 1064 (10th Cir.1992), *cert. denied*, 506 U.S. 1056, 113 S.Ct. 987, 122 L.Ed.2d 139 (1993); *Soundingsides*, 820 F.2d at 1242; *see also United States v. Boyles*, 57 F.3d 535, 541 (7th Cir.1995); *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985).

A specific intent crime is one in which an act was committed voluntarily and purposely with the specific intent to do something the law forbids. In contrast, a general intent crime is one in which an act was done voluntarily and intentionally, and not because of mistake or accident. In short, a specific intent crime is one in which the defendant acts not only with knowledge of what he is doing, but does so with the objective of completing some unlawful act.

*United States v. Blair*, 54 F.3d 639, 642 (10th Cir.) (quotation marks, citations and parenthetical information omitted), *cert. denied*, 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 151 (1995). Thus, "specific intent" refers to the "unique state of mind beyond any mental state required with respect to the actus reus of the crime." Vivian M. Rodriguez, *The Admissibility of Other Crimes, Wrongs or Acts Under the Intent Provision of Federal Rule of Evidence 404(b): The Weighing of Incremental Probity and Unfair Prejudice*, 48 U. Miami L.Rev. 451, 460 (1993).[11]

■ We begin our analysis by focusing on Counts 1 and 9 because the crimes charged in these counts are "specific intent crimes." Count 9 charged Mr. Jackson "knowingly and intentionally possess[ed] with intent to distribute a quantity of cocaine base (crack), a schedule II controlled substance ... in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 [aiding and abetting]." Possession with intent to distribute is a specific

---

**11.** The distinction between specific intent crimes and general intent crimes is more fully explained as follows:

Where a crime requires proof of specific intent, the prosecution must prove that the accused knowingly committed (or failed to commit) an unlawful act, purposely intending to violate the law. The Burger Court, in an attempt to set a standard for defining the intent element of crimes, stated that "[i]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." Consistent with this view is that a charge of knowingly or intentionally committing the alleged unlawful acts does not create a specific intent crime.

*Id.* at 460–61 (footnotes and citations omitted). *See also* Chad J. Layton, Comment, *No More Excuses: Closing the Door on the Voluntary Intoxication Defense*, 30 J. Marshall L.Rev. 535, 553–54 (1997) (noting the distinction between specific intent and general intent crimes was created by the common law courts specifically to contend with the mens rea problem created by intoxicated criminal actors, and defining general intent crimes as "those crimes where the definition describes a particular act without referring to an intent to achieve a further consequence" and a specific intent crime as requiring "more than a mere intention to perform an act. The actor must have an additional state of mind intending that further consequences result from his act." (Footnotes and citations omitted.)).

intent crime because it "requires the government to establish that defendants knowingly possessed the drug with the specific intent to distribute it." *United States v. Wood,* 57 F.3d 913, 918 (10th Cir.1995). *See also United States v. Reece,* 86 F.3d 994, 996 (10th Cir.1996). Mr. Jackson was also charged under an aiding and abetting theory in Count 9. "Whoever ... aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal." 18 U.S.C. § 2(a). "To be guilty of aiding and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own." *United States v. Anderson,* 189 F.3d 1201, 1207 (10th Cir. 1999). *See also United States v. Smith,* 133 F.3d 737, 742 (10th Cir.1997) ("To be liable as an aider and abettor under 18 U.S.C. § 2, the evidence must establish a defendant associated himself with a criminal venture; participated in the venture as something he wished to bring about; sought by his actions to make the venture succeed; and the evidence must establish

both the commission of the offense by someone and the aiding and abetting by the defendant."), *cert. denied,* 524 U.S. 920, 118 S.Ct. 2306, 141 L.Ed.2d 165 (1998). Thus, the crime of aiding and abetting is a specific intent crime because it requires the defendant to act willfully by participating in the venture and also requires the defendant to have the specific intent to make the venture succeed through his or her acts. Therefore, voluntary intoxication is a potential defense for an aiding and abetting charge. *See United States v. Nacotee,* 159 F.3d 1073, 1076 (7th Cir.1998) (holding the crime of aiding and abetting requires "the specific intent to aid in the commission of the crime in doing whatever [the defendant] did to facilitate its commission" and therefore, the defendant's "voluntary intoxication, if sufficient to negate the required intent to aid and abet, would provide [the defendant] with a defense."); *United States v. Sayetsitty,* 107 F.3d 1405, 1412 (9th Cir.1997) (holding because aiding and abetting requires an element of specific intent, the court erred by refusing to give a voluntary intoxication instruction).[12]

12. Although this circuit has not explicitly stated we consider aiding and abetting to be a specific intent crime, in *United States v. Hatatley,* 130 F.3d 1399 (10th Cir.1997), we indicated our approval of the majority rule by concluding the defendant's due process rights were not violated by the court allowing the government to drop an aiding and abetting charge. *Id.* at 1404–05. We reasoned that by allowing the government to proceed against the defendant only as a principal on the theories of voluntary manslaughter and second degree murder, expert testimony on the defendant's state of voluntary intoxication during the crimes was rendered irrelevant because these are general intent crimes for which voluntary intoxication is not a defense. *Id.* at 1405. Other circuits consider aiding and abetting to be a specific intent crime. *See, e.g. United States v. Garth,* 188 F.3d 99, 113 (3d Cir.1999) ("Thus, liability for aiding and abetting someone else in the commission of a crime requires the specific intent of facilitating the crime."); *United States v. Wilson,* 160 F.3d 732, 738 (D.C.Cir.1998) ("Aiding and abetting requires the government to prove: (1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge (3) that the other was committing

an offense; and (4) assisting or participating in the commission of the offense." (Quotation marks and citations omitted.)), *cert. denied,* —— U.S. ——, 120 S.Ct. 81, 145 L.Ed.2d 69 (1999); *United States v. Pipola,* 83 F.3d 556, 562 (2d Cir.) (stating that under 18 U.S.C. § 2(a), "[t]he government must ... prove the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime. To show specific intent the prosecution must prove the defendant knew of the proposed crime—suspicion that it might occur is not enough—and had an interest in furthering it." (Citations omitted.)), *cert. denied,* 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Head,* 927 F.2d 1361, 1373 (6th Cir.) ("We also agree that it must be shown that appellant acted or failed to act with the specific intent to facilitate the commission of a crime by another."), *cert. denied,* 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991). *But see United States v. Roan Eagle,* 867 F.2d 436, 445 (8th Cir.) (indicating aiding and abetting is not a specific intent crime because the defendant is required to only

Count 1 charged Mr. Jackson with conspiring "to possess with intent to distribute and [conspiring] to distribute cocaine base (crack), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1)." All conspiracy crimes are specific intent crimes. *See Blair*, 54 F.3d at 642. "The specific intent required for the crime of conspiracy is in fact the intent to advance or further the unlawful object of the conspiracy." *Id.* (quotation marks and citations omitted). Thus, conspiracy to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance are specific intent crimes. *See United States v. Merriweather*, 78 F.3d 1070, 1078 (6th Cir.1996) (holding conspiracy to distribute a controlled substance is a specific intent crime).

> To find a defendant guilty of conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846, the jury must find, beyond a reasonable doubt, (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators.

*United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir.1997), *cert. denied*, 523 U.S. 1144, 118 S.Ct. 1856, 140 L.Ed.2d 1104 (1998). "The essence of the crime of conspiracy is an agreement to commit an unlawful act." *United States v. Peveto*, 881 F.2d 844, 855 (10th Cir.) (quotation marks and citation omitted), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). "It is permissible for the jury to infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *Carter*, 130 F.3d at 1439 (quotation marks and citation omitted). Thus, in order to prove Mr. Jackson conspired to distribute the crack, the government had

share the intent of the underlying offense and is not required to have the specific intent to aid and abet the commission of the crime),

to show Mr. Jackson agreed to facilitate the distribution of the crack cocaine with his coconspirators. *See id.* In order to prove Mr. Jackson committed conspiracy to possess with the intent to distribute a controlled substance, the prosecution needed to prove Mr. Jackson had the specific intent to further his *coconspirator's* possession of the crack with intent to distribute. *Cf. id.* at 1441 (holding because possession with intent to distribute was the unlawful object of the alleged conspiracy, the defendant could be deemed to have possessed the controlled substance through his coconspirator's possession).

The record contains evidence that Mr. Jackson habitually used crack cocaine. Thus, he may have been under the influence of drugs during certain transactions. However, we agree with the district court that the evidence did not support a finding Mr. Jackson was unable to form the specific mental state required by the crimes charged in Counts 1 and 9. As the district court noted, the witnesses who testified concerning Mr. Jackson's participation in the conspiracy described his

> dealing and speaking in terms of amounts, money payments, traveling to and from to the source, facilitating the purchase or sale of cocaine, arranging for his own rides and transportation, tending to the details of the transactions, and in not a single instance ... was there any appearance of any diminished capacity to do those things which we heard about and saw him do.

The court was able to observe Mr. Jackson's demeanor during some of these transactions on the video tapes taken from the FBI undercover car. While the tapes were played in court, they are not a part of the record on appeal. Thus, we defer to the district court's interpretation of Mr. Jackson's demeanor and lucidity during these transactions. Furthermore, although some of the codefendants admitted

*cert. denied*, 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 199 (1989).

they had been addicted to crack cocaine and testified concerning the effects of crack cocaine on their mental processes, none of the testimony indicated Mr. Jackson was unable to form the specific intent to possess with intent to distribute crack cocaine, to aid in the distribution of the crack, or to agree to assist Ms. Jackson in the distribution of the drugs. While it is clear Mr. Jackson was a heavy user of crack cocaine during the conspiracies charged in Count 1, and it is highly likely he was under the influence of crack cocaine during some of the transactions underlying the charges in Count 9, none of the witnesses testified Mr. Jackson's mental capacity was so impaired that he was unable to agree to assist Ms. Jackson in her criminal endeavors or was unable to facilitate the transactions. While Mr. Jackson may have been motivated to participate in the conspiracy to distribute crack cocaine in order to obtain crack for his personal use because of his addiction to crack cocaine, Mr. Jackson's status as a drug addict is not sufficient to put his mental capacity at issue. *See United States v. Coffman,* 567 F.2d 960, 963 (10th Cir.1977) ("[A]n element of reasoned choice yet exists when an addict knowingly violates the law in acquiring and using drugs. One is not excused for offending simply because he wanted to very, very badly.") (Quoting *Bailey v. United States,* 386 F.2d 1, 4 (5th Cir.1967), *cert. denied,* 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968).). Because there was no evidence suggesting Mr. Jackson's mental capacity was so impaired by his voluntary ingestion of crack cocaine that he was unable to form the specific intent necessary to commit the crimes charge in Counts 1 and 9, we conclude the district court did not err by declining to give the proffered instruction.

### 2. Counts 3 and 4

 Mr. Jackson also contends the district court erred by failing to give the diminished capacity instruction for Counts 3 and 4. In Counts 3 and 4, Mr. Jackson was charged with distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1). 21 USC § 841(a)(1) provides: "[I]t shall be unlawful for any person *knowingly or intentionally* . . . to manufacture, *distribute,* or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." (Emphasis added.) As noted above, possession of a controlled substance with the intent to distribute it under 21 USC § 841(a)(1) is a specific intent crime requiring proof of two mens rea: 1) either knowledge or intent to possess; and 2) the intent to distribute. However, a charge of simple distribution only requires the government to prove the defendant knowingly or intentionally distributed the controlled substance. *See Torres,* 53 F.3d at 1135 (" '[T]he essential elements of a prima facie case of distribution of a controlled substance are: (1) knowing or intentional; (2) distribution; (3) of a controlled substance.' " (Quoting *United States v. Santistevan,* 39 F.3d 250, 255 (10th Cir.1994).). *See also United States v. Johnson,* 130 F.3d 1420, 1429 (10th Cir.1997), *cert. denied,* 525 U.S. 829, 119 S.Ct. 78, 142 L.Ed.2d 61 (1998). Therefore, unlike a charge of possession with intent to distribute, a charge of simple distribution is a general intent crime. *See United States v. Manganellis,* 864 F.2d 528, 533–39 (7th Cir.1988). Voluntary intoxication is not a defense to a general intent crime. *See Hatatley,* 130 F.3d at 1405 (citing *Sands,* 968 F.2d at 1064)). Therefore, the proposed instruction was inapplicable to the crimes charged, and the district court did not err by declining to instruct the jury on diminished capacity due to voluntary intoxication for Counts 3 and 4.[13]

---

**13.** Mr. Jackson also asserts the diminished capacity instruction should have been given for Count 4 because the jury was instructed it could find Mr. Jackson guilty on those counts if it found he had aided or abetted the principal in the perpetration of the crimes. For the reasons set forth above, we reject this argument.

### 3. Lesser Included Offense Instruction

■ Mr. Jackson next contends the district court erred by failing to instruct the jury that simple possession of a controlled substance (21 U.S.C. § 844) was a lesser included offense of the charges in Counts 1, 3 and 4. In order for a defendant to be entitled to a lesser included offense instruction, four factors must be present:

> (1) there was a proper request; (2) the lesser included offense includes some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.

*United States v. Moore,* 108 F.3d 270, 272 (10th Cir.1997). In denying Mr. Jackson's request for the instruction on Counts 1, 3, and 4, the district court focused on the final element described in *Moore* and concluded the evidence could not support a determination that Mr. Jackson was guilty of mere possession, but not guilty of distribution of crack cocaine.[14]

On appeal, Mr. Jackson contends the evidence was sufficient to support a finding that he was only guilty of simple possession, in violation of 21 U.S.C. § 844.[15] Mr. Jackson argues the evidence of his addiction to crack cocaine could have led the jury to reasonably infer he lacked intent to distribute the crack because his only motivation was to obtain crack for his personal use. The government contends the district court correctly determined the evidence was not sufficient to warrant the instruction. The government further asserts the instruction was not warranted because the second factor set forth under *Moore* was not present. The government argues the offense of simple possession of a controlled substance includes at least one element, possession, not required for proof of conspiracy or distribution, the offenses charged in Counts 1, 3 and 4.

■ We first address the government's argument that an instruction on simple possession would have been incorrect because it is not a lesser included offense of conspiracy to possess with intent to distribute or the offense of possession with intent to distribute.[16] A criminal defendant is entitled to an instruction on a lesser included offense if the purported lesser included offense is "an offense necessarily included in the offense charged." Fed.R.Crim.P. 31(c). Interpreting this language, the Supreme Court has set forth an "elements" test to determine whether an offense is "necessarily included" in another. Under the elements test, "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." *Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Thus, to determine whether an offense is a lesser and included offense of the crime charged, we compare the elements of the particular crimes to see if the asserted lesser offense is a subset of the crime charged.

■ Count 1 charged Mr. Jackson with conspiracy to possess with intent to distribute and to distribute crack cocaine. In *United States v. Horn,* 946 F.2d 738 (10th Cir.1991), we applied the elements test outlined in *Schmuck* and held simple possession is not a lesser included offense

---

**14.** The district court gave a lesser included instruction on Count 9, possession with intent to distribute.

**15.** 21 U.S.C. § 844 provides in pertinent part: "It shall be unlawful for any person knowingly or intentionally to possess a controlled substance."

**16.** Although the district court did not specifically address this issue, we may affirm the district court's decision on any basis supported by the record, even if not relied upon by the district court. *United States v. Winningham,* 140 F.3d 1328, 1332 (10th Cir. 1998).

of conspiracy to possess a controlled substance with intent to distribute or of conspiracy to distribute a controlled substance. *Id.* at 744. We reached this conclusion because possession of a controlled substance includes an element not required by these conspiracy offenses—the element of possession. . *Id.* at 744–45. "Stated another way, it is possible to conspire to commit these drug offenses [possession, possession with intent to distribute and distribution] without actually committing the offenses themselves; thus, it is not impossible to commit the greater offense (conspiracy) without committing the suggested lesser offenses." *Id.* at 745. Therefore, we conclude the district court did not err by refusing to give the simple possession instruction with regards to Count 1.

■ We now turn to the applicability of the lesser included instruction to Counts 3 and 4. Counts 3 and 4 charged Mr. Jackson with "knowingly and intentionally distribut[ing] a quantity of cocaine base (crack), a Schedule II controlled substance," in violation of 21 U.S.C. § 841(a)(1). As stated earlier, 21 U.S.C. § 841(a)(1) provides: "[I]t shall be unlawful for any person knowingly or intentionally to manufacture, *distribute*, or dispense, *or possess with intent to* manufacture, *distribute*, or dispense, a controlled substance." (Emphasis added.) It is clear, from a plain reading of 21 U.S.C. § 841(a)(1), that Congress intended to create several separate crimes within the statute. *See United States v. Gomez*, 593 F.2d 210, 213 & n. 5 (3d Cir.), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2172, 60 L.Ed.2d 1052 (1979). *See also United States v. Randall*, 171 F.3d 195, 206 (4th Cir.1999) (" 'Distribution and possession with intent to distribute are two separate trafficking offenses, two separate crimes.' ") (Quoting *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir.1994).). Therefore, § 841(a)(1) prohibits the distribution of a controlled substance as well as the possession of a controlled substance

with the intent to distribute it. We have previously held simple possession is a lesser included offense of possession of a controlled substance with the intent to distribute under 21 U.S.C. § 841(a)(1). *See United States v. Lacey*, 86 F.3d 956, 970 (10th Cir.), *cert. denied*, 519 U.S. 944, 117 S.Ct. 331, 136 L.Ed.2d 244 (1996). However, it does not follow that simple possession is a lesser included offense of distribution under 21 U.S.C. § 841(a)(1). Distribution means "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11). The term "deliver" is defined as "the actual, constructive, or attempted *transfer* of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8) (emphasis added). Although distribution may involve the actual or constructive possession of a controlled substance, courts have construed the term "distribution" broadly to "include other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price." *United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir.) (collecting cases), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983). *See also United States v. Sepulveda*, 102 F.3d 1313, 1317 (1st Cir. 1996); *United States v. Pungitore*, 910 F.2d 1084, 1133–34 (3d Cir.1990) (defendant who authorizes another to arrange a drug deal is guilty of distribution), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2010, 114 L.Ed.2d 98 (1991); *United States v. Crockett*, 813 F.2d 1310, 1316 (4th Cir.) ("distribution[ ] requires either physical transfer of the drug or other acts in furtherance of the transfer."), *cert. denied*, 484 U.S. 834, 108 S.Ct. 112, 98 L.Ed.2d 71 (1987); *United States v. Oquendo*, 505 F.2d 1307, 1310 & n. 1 (5th Cir.1975) (where the defendant was convicted for distribution of heroin although he never touched the drugs, but arranged the sale, assisted in the negotiations, and accepted payment on behalf of his "partner," and

the court noted "the definition of 'distribute' contained in the statute is broad enough to include acts that traditionally perhaps would have been defined as mere aiding and abetting."). Although it may be unusual for a person to distribute a controlled substance without at least momentarily possessing the controlled substance, it is not impossible. *See United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998) (noting other circuits have held "proof of distribution does not necessarily include the element of possession" and a "distribution charge can conceivably be proved without proof of possession" (quotation marks and citations omitted)); *Sepulveda*, 102 F.3d at 1317 (in discussing whether the offense of simple possession merges with offense of distribution, the court stated: "It is possible—albeit unusual—to be guilty of distribution of a drug without also possessing it with intent to distribute. Someone who participates in a drug transfer—*e.g.*, as a broker or armed guard—can be liable for distribution without ever possessing the

drugs."); *United States v. Stevens*, 521 F.2d 334, 337 n. 2 (6th Cir.1975) ("[T]he distribution charge can conceivably be proved without proof of possession."). Therefore, simple possession is not a lesser included offense of distribution under the "elements test" outlined in *Schmuck*. *See Randall*, 171 F.3d at 209 ("possession with intent to distribute requires an element that is not necessarily an element of distribution—possession."); *United States v. Tejada*, 886 F.2d 483, 490 (1st Cir.1989) (holding possession with intent to distribute was not a lesser included offense of distribution because distribution does not necessarily include the element of possession); *United States v. Barrientos*, 758 F.2d 1152, 1158 (7th Cir.1985) (@holding possession is not a necessary element of distribution), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986).[17] Consequently, the district court did not err by denying Mr. Jackson's request for the lesser included instruction for distribution in Counts 3 and 4.[18]

**17.** In *United States v. Burns*, 624 F.2d 95 (10th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980), the appellants were charged with distribution as well as possession with intent to distribute. *Id.* at 104. However, the jury was only given an instruction on possession with intent to distribute. *Id.* Although the jury was given the entire indictment, the court did not explicitly instruct the jury to disregard the distribution charge. *Id.* We concluded this was not reversible error because the jury received proper instructions on the possession with intent charge. *Id.* However, we went on to conclude the trial court did not commit reversible error by failing to instruct the jury to disregard the distribution charge because possession is a lesser included offense of distribution. *Id.* at 105 (citing *United States v. Klugman*, 506 F.2d 1378, 1378 (8th Cir. 1974)). We stated, "Because the offense of 'distribution' must occur 'knowingly or intentionally' (21 U.S.C. § 841(a)), 'possession with intent to distribute' is also a lesser included offense of distribution. Thus, in accordance with our earlier analysis, a finding of guilt as to distribution necessarily establishes the jury's belief that appellants possessed the cocaine with an intent to distribute." *Burns*, 624 F.2d at 105. However, this language was dicta in that the holding of

the opinion rested on other grounds. Furthermore, we did not address whether the element of "possession" was necessarily included within the offense of "distribution." Therefore, we do not consider the language contained in *Burns* to be binding precedent in this circuit. Finally, we note the Eighth Circuit has held simple possession is a lesser included offense of distribution. *See United States v. Campbell*, 652 F.2d 760, 762 n. 3 (8th Cir.1981); *United States v. Howard*, 507 F.2d 559, 561 n. 4 (8th Cir.1974). However, this appears to be the minority position. We find the reasoning of the circuits in the cases cited above to be more persuasive.

**18.** Having determined the district court did not err by refusing to give the lesser included instruction because simple possession is not a lesser included offense of the charges in Counts 1, 3 and 4, we note the district court did not abuse its discretion by determining the evidence would not allow a rational jury to convict Mr. Jackson of simple possession, but acquit him of the original charges. *See Hatatley*, 130 F.3d at 1403 ("The trial judge does not abuse [its] discretion by refusing to instruct on a lesser included offense when the evidence before [it] provides no rational basis upon which the jury could find the defendant guilty of the lesser offense."). The evidence

## B. Sufficiency of the Evidence

Mr. Jackson also asserts the evidence presented at trial was insufficient to support his convictions. In making this argument, Mr. Jackson faces a high hurdle:

[I]n reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record *de novo* and ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.

*United States v. Voss,* 82 F.3d 1521, 1524–25 (10th Cir.) (quotation marks and citations omitted), *cert. denied,* 519 U.S. 889, 117 S.Ct. 226, 136 L.Ed.2d 158 (1996). After examining the record, we conclude the evidence was sufficient to support Mr. Jackson's convictions on Counts 1, 3, 4, and 9.

 As to Count 1, conspiracy to possess with intent to distribute and conspiracy to distribute cocaine base (crack), in violation of 21 U.S.C. § 846, the evidence indicated Mr. Jackson agreed with Ms. Jackson to violate the law, knew the essential objectives of the conspiracy, was voluntarily involved in the distribution of the crack cocaine, and performed tasks for Ms. Jackson in furtherance of the conspiracy. *See Carter,* 130 F.3d at 1439. As discussed above, Mr. Jackson's status as a crack addict did not prevent him from forming the intent to commit these crimes and did not excuse his acts. Furthermore, the evidence indicated Mr. Jackson was more than a mere buyer—he was intimately involved in various aspects of the distribution of the crack cocaine.

 Mr. Jackson also contends the evidence was insufficient to establish he was a member of a single conspiracy. In support of his argument, Mr. Jackson relies upon *United States v. McIntyre,* 836 F.2d 467 (10th Cir.1987), where we stated:

To make a finding of a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal. To satisfy this common objective test ... the essential element of interdependence must be met—each alleged coconspirator must depend on the successful operation of each link in the chain to achieve the common goal. The important question in a drug transaction is whether the separate transactions constituted essential and integral steps toward the realization of a common, illicit goal.

*Id.* at 471 (quotation marks, brackets, and citation omitted). Mr. Jackson contends the government failed to prove the element of interdependence because the evidence did not show Ms. Jackson's operation would have failed without his assistance. However, the government did not need to prove Mr. Jackson was an indispensable link in the conspiracy. The government was only required to demonstrate the conspirators relied upon one another to achieve a shared criminal objective, their actions were "interconnected in some way," and Mr. Jackson facilitated the venture as a whole or furthered the endeavors of the other alleged conspirators. *United States v. Evans,* 970 F.2d 663, 670–71 (10th Cir.1992), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). *See also United States v. Slater,* 971 F.2d 626, 630 (10th Cir.1992). Here, the evidence showed Ms. Jackson

showed Mr. Jackson facilitated the negotiations by acting as a "middle man" for Ms. Jackson. Mr. Jackson's argument that he was motivated only by a desire to obtain crack cocaine for personal use is inapposite. *See Coffman,* 567 F.2d at 963. In addition, Count 4 charged Mr. Jackson with distributing the crack cocaine in violation of 18 U.S.C. § 2,

the aiding and abetting statute. Although Mr. Jackson did not directly address the aiding and abetting charge contained in Count 4, we also conclude the instruction was not necessary because simple possession is also not a lesser included offense of aiding and abetting the distribution of crack cocaine.

depended upon Mr. Jackson to perform various roles in the drug distribution conspiracy such as acting as a runner, a middleman and a guard. These were important steps toward the realization of the common goal of crack cocaine distribution. *See United States v. Fox,* 902 F.2d 1508, 1514–16 (10th Cir.) (holding the government proved interdependence where the defendant traveled with a co-conspirator to purchase cocaine from their supplier, contributed funds to buy cocaine wholesale, and attended a meeting where the distribution scheme was discussed and the defendant offered to purchase a large amount of cocaine), *cert. denied,* 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). Thus, the element of interdependence was sufficiently established.

 As to Count 9 (possession with intent to distribute), Mr. Jackson contends the evidence was insufficient to support his conviction because the government failed to establish he possessed crack cocaine on February 10, 1998, the date charged in the indictment. However, he was also charged under an aiding and abetting theory in Count 9. "[A]cts committed in furtherance of the commission of a crime by another constitute 'abetting.'" *Slater,* 971 F.2d at 632 (citation omitted). "Participation in the criminal venture may be established by circumstantial evidence and the level of participation may be of 'relatively slight moment.'" *United States v. Leos–Quijada,* 107 F.3d 786, 794 (10th Cir.1997). We conclude the evidence was sufficient to convict Mr. Jackson of aiding and abetting Ms. Jackson in her possession of crack

cocaine with the intent to distribute on February 10, 1998.[19]

In *Slater,* we rejected the same argument raised by Mr. Jackson and pointed out one

"may 'abet' the crime of possession with intent to distribute by procuring the customers and maintaining the market in which the possession is profitable, even though you do nothing else to help the possessor get or retain possession. Middlemen aid and abet the offense of possession with intent to distribute."

971 F.2d at 632 (quoting with approval *United States v. Wesson,* 889 F.2d 134, 135 (7th Cir.1989)). Furthermore, if we were to hold one cannot be convicted of aiding and abetting the possession of a controlled substance with the intent to distribute without proving possession, this would be tantamount to holding one cannot be convicted of aiding and abetting without committing the principal offense. Such a result would dismantle the crime of aiding and abetting. *Id.* at 632–33. The evidence showed Mr. Jackson assisted Ms. Jackson in her undertaking. By giving purposeful support to that endeavor, Mr. Jackson violated 18 U.S.C. § 2. Consequently, Mr. Jackson's argument concerning the sufficiency of the evidence to support the jury's finding on Count 9 fails.

Mr. Jackson's argument concerning the sufficiency of the evidence to support his conviction of distribution of a controlled substance (Counts 3 and 4), is a repetition of his assertion that his status as a drug addict negated the mens rea for the crime—knowing and intentional distribu-

---

**19.** February 10, 1998 was the date Ms. Jackson was arrested when returning from her supplier with crack cocaine. The evidence established that on February 10, 1998, Mr. Jackson assisted Ms. Jackson by attempting to arrange a sale of one ounce of crack to Ms. Bromlow. Because Ms. Jackson did not have that quantity of crack cocaine on hand, Mr. Jackson maintained contact with Ms. Bromlow and assured her they would soon have the drugs, and asked Ms. Bromlow not to go to their competitors for the crack. Ms. Brom-

low testified Mr. Jackson told her he was "holding down the fort" at Ms. Jackson's residence while Ms. Jackson went to acquire the crack from her supplier. On the way back from her supplier, Ms. Jackson was arrested and searched, but was released when the officers failed to discover the crack cocaine where she had hidden it. After Ms. Jackson returned with the crack, Mr. Jackson tried to convince Ms. Bromlow to return to Ms. Jackson's residence to buy the ounce of cocaine.

tion.[20] As discussed above, we reject this argument and hold the evidence was sufficient to establish Mr. Jackson committed the knowing and intentional distribution of crack cocaine.

## C. Sentencing

 Mr. Jackson finally contends the district court erroneously included the 224 grams of crack cocaine allegedly obtained during trips to Lawton, Oklahoma, with Ms. Jackson in the calculation of his guidelines sentence.[21] We review the district court's calculation of drug quantities for the purpose of sentencing for clear error. *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir.1999). "[We] will reverse only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Roach*, 978 F.2d 573, 575 (10th Cir.1992). The government bears the burden of establishing the necessary factors at the sentencing hearing by a preponderance of the evidence. *United States v. Beaulieu*, 893 F.2d 1177, 1182 n. 7 (10th Cir.), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990). The evidence at sentencing need not comply with the Federal Rules of Evidence. *United States v. Jimenez*, 928 F.2d 356, 365 (10th Cir.), *cert. denied*, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991); Fed.R.Evid. 1101(d)(3). The only requirement is the information relied upon by the sentencing court "has sufficient indicia of reliability." *United States v. Cody*, 7 F.3d 1523, 1527 (10th Cir.1993). Thus, in deter-

mining the appropriate punishment, the sentencing court may consider reliable hearsay. *Roach*, 978 F.2d at 576. The court may also rely upon estimates of drug quantity "if they are based on information that has a 'minimum indicia of reliability.' " *United States v. Shewmaker*, 936 F.2d 1124, 1130 (10th Cir.1991) (quoting *United States v. Davis*, 912 F.2d 1210, 1214 (10th Cir.1990)) (further citations omitted), *cert. denied*, 502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). Because Mr. Jackson was convicted of conspiracy, the court was allowed to base its sentence not only on the amount of crack he personally handled, but was also allowed to consider "any amounts which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators." *Vaziri*, 164 F.3d at 568 (quotation marks and citation omitted).

 At the sentencing hearing, Agent Manns testified regarding both the frequency of the trips Mr. Jackson took to obtain crack cocaine with Ms. Jackson and the amount of crack cocaine they procured each time they visited Ms. Jackson's supplier. Agent Manns' testimony was based on the statements of Ms. Warren and Mr. John Nunn. Agent Manns interviewed Ms. Warren several times about the crack cocaine distribution operation. Agent Manns testified he found Ms. Warren to be truthful. The court remembered Ms. Warren's testimony in previous trials and hearings and agreed with Agent Manns' assessment of Ms. Warren's credibility. Ms. Warren told Agent Manns that Mr. Jackson accompanied Ms. Jackson to ob-

---

**20.** In his brief, Mr. Jackson includes Count 2, maintaining a place for the distribution of controlled substances, in his argument concerning the sufficiency of the evidence on Counts 3 and 4. Mr. Jackson was acquitted of Count 2, and we regard his inclusion of this count under his argument concerning the distribution counts as a mere typographical error.

**21.** Mr. Jackson also argues, apparently for the first time on appeal, that attributing the full 224 grams of crack cocaine to him also resulted in a higher statutory minimum sentence—

twenty years. Mr. Jackson admits he did not object to the 21 U.S.C. § 851 enhancement based on a prior felony. Mr. Jackson was ultimately sentenced under the guidelines to 262 months (twenty-one years and ten months). *When the guidelines sentence is greater than the statutory minimum sentence, the guidelines sentence is imposed. See USSG § 5G1.1(b).* Thus, for a variety of reasons, we do not address Mr. Jackson's argument concerning the statutory minimum sentence.

tain crack from her supplier at least four times during the relevant time frame. Agent Manns also interviewed Mr. Nunn concerning the distribution scheme. According to Mr. Nunn, Mr. Jackson claimed to have often accompanied Ms. Jackson when she made her weekly trip to procure crack cocaine from her supplier. Agent Manns testified he believed Mr. Nunn to be a credible witness. There is nothing in the record to indicate the statements of these witnesses were unreliable. Thus, we conclude the court did not err by finding Mr. Jackson responsible for the crack cocaine obtained in four trips to Ms. Jackson's supplier.

The testimony concerning the amount of crack cocaine obtained in each of the four trips was conflicting. Ms. Wiseman told Agent Manns the amount of crack cocaine Ms. Jackson acquired as a result of each trip to her supplier varied from one to two ounces. On the other hand, Mr. Nunn told Agent Manns that Mr. Jackson had claimed Ms. Jackson obtained two ounces of crack cocaine each time she went to her supplier. In addition, Agent Manns testified he was told by Ms. Warren she had seen Ms. Jackson in possession of two ounces of crack cocaine. Ms. Edmondson told Agent Manns she also saw Ms. Jackson with multiple ounces of crack. Keeping in mind our standard of review, we conclude the district court did not err in estimating the amount of crack cocaine attributable to Mr. Jackson. The evidence offered by the government was not without factual support. The court did not err by concluding Agent Manns' testimony, although based on the out of court statements of others, was reliable. For the foregoing reasons, we affirm all the district court's rulings in Mr. Jackson's case.

The judgments of the district court in cases 98–6487 and 99–6090 are **AFFIRMED**.

McKAY, Circuit Judge, concurring:

I join the court's result and its opinion except for a brief part which I consider to be dicta. I write separately only to emphasize that the question of cash payment by the government for testimony remains open under *Singleton*. Also, the question of who has the burden to show that such payments are "traditional" remains open. *United States v. Medina*, 41 F.Supp.2d 38, 51–52 (D.Mass.1999). *Medina* in fact holds that they are not. I would follow *Medina*, including its burden-shifting mechanism. The government, unlike an accused person, is in a unique position to prove its "tradition" if one exists. The "we have always done it that way" response to what is a violation of the plain language of the statute is a confession and avoidance response-in other words, an affirmative defense.

I end where I began. These issues remain open, and these comments and any suggestion in the court's opinion which appear to foreclose them remain dicta.