UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

MILLARD LACY,

        Defendant - Appellant.

No. 00-2091

(District of New Mexico)

(D.C. No. CR-99-439-BB)

---

ORDER
Filed July 18, 2001

---

Before **ANDERSON** and **LUCERO**, Circuit Judges, and **MILLS**, District Judge.[*]

---

The Court issued an Order and Judgment in this case on May 31, 2001. The Court grants the petition for rehearing in part and substitutes the following language in place of the last two sentences beginning on page 10 and concluding on page 11:

Although Officer Salazar did not inform Millard that he could refuse to consent to the search—a factor which courts can take into account when considering the voluntariness of a search—such an admonition is not required and its absence does not affect our resolution. See United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997)

---

[*]The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

(police officer was not obligated to inform suspect that he was free to refuse consent to a search). The totality of circumstances clearly establishes that Millard voluntarily consented to Officer Salazar's search.

In all other respects, the petition for rehearing is denied. A copy of the amended order and judgment is attached to this order.

Entered for the Court

PATRICK FISHER, Clerk of Court

by:

Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 31 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MILLARD LACY,

Defendant - Appellant.

No. 00-2091

(District of New Mexico)

(D.C. No. CR-99-439-BB)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON** and **LUCERO**, Circuit Judges, and **MILLS**, District Judge.[**]

**I. BACKGROUND**

Officers John Salazar, Robert D. Sanchez and Michael Teague were all part of a

Drug Enforcement Agency (DEA) interdiction team in Albuquerque, NM. As part of

their duties, the team routinely went to the Albuquerque train station to meet the

eastbound Amtrak train when it stopped on its Los Angeles to Chicago route. Prior to the

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Richard Mills, Senior United States District Judge for the Central
District of Illinois, sitting by designation.

train's arrival, officers would review passenger reservations by checking Amtrak's computer records. Officers were looking for reservations that fit drug trafficking profiles (*i.e.*, one-way tickets, made close to the time and date of departure and paid for in cash).

On March 23, 1999, Officer Teague, reviewed the reservation record of Amtrak passengers Millard and Gregory Lacy. Millard and Gregory were traveling together, sharing a room in the train's sleeping car, and they bought their tickets with cash. The Lacys originally reserved tickets for March 22, but they missed that train and had to take the March 23 train instead. On their way to meet the Lacys' train, Officers Teague, Sanchez, and Salazar made several calls to the call-back number the Lacys provided to Amtrak. The phone had been disconnected.

When the officers reached the station, Officer Salazar spoke with the Amtrak attendant for the sleeper car occupied by the Lacys. The attendant described the Lacys, said they were staying in two rooms in the same car, and then pointed them out to Officer Salazar. The Lacys were several feet away from Officer Salazar. Officer Salazar observed them for some time and watched as they used the public telephones. When Officer Salazar walked toward the Lacys, Millard began to walk back to the train and board. Officer Salazar turned on a tape recorder he carried on his belt and walked up to Millard. Officer Salazar was in street clothes and did not have a weapon visible. He identified himself as a police officer and asked Millard if he could speak to him "for a second." Millard said that he could. Officer Salazar asked Millard for identification and

2

Millard gave him a copy of a California identification card bearing his name. Officer Salazar looked at the card and returned it to Millard. When Officer Salazar asked Millard if he had any luggage, Millard said that he had a bag and a radio in his room. Officer Salazar thought that it was "kind of weird" to include a radio with luggage, so he told Millard to show him the radio. Millard did not object. He walked to his room on the second floor of the sleeper car and Officer Salazar followed. Officer Salazar asked Millard if he was traveling with anybody else and Millard said that he was traveling with his brother Greg. When Millard reached his room, Officer Salazar noted that the door was open and the curtain had been drawn. Millard drew aside the curtain and motioned with his hand toward the room. At that point, Officer Salazar told Millard about his duties as an interdiction officer. He said that it was his job to talk with passengers because "we have problems with people carrying contraband, . . . narcotics, weapons, guns, all kinds of stuff." Officer Salazar asked Millard if he could search the room and Millard said "Yes."

Meanwhile, Gregory Lacy began to approach the room. As he did so, Officer Sanchez arrived. Officer Sanchez stopped Gregory and asked him for identification. Gregory claims that he identified himself as Gregory Lacy. However, he produced a college identification card bearing the name of his younger brother, Michael Lacy. Officer Sanchez knew that the train reservation had been made in the names of Gregory and Millard Lacy. He asked Gregory if his name was Gregory or Michael, the name that

3

appeared on the card. Gregory said his name was Michael, and that Gregory was the name of his younger brother, in whose place he had come. From that point on, Officer Sanchez addressed Gregory as Michael and Gregory assumed that identity. Officer Sanchez asked for permission to search the room and luggage. Gregory consented, but Officer Sanchez's search revealed nothing. Officer Sanchez's entire encounter with Gregory lasted about seven minutes. When it was over, Officer Sanchez released Gregory and went to Millard's room to assist Officer Salazar.

Gregory followed Officer Sanchez to Millard's room. As the two men stood in the hallway outside the room, Officer Salazar asked Millard if the person standing with Officer Sanchez was his brother Greg. Millard said that it was not, that Greg was one of his brothers, but the person in the hallway was Michael Lacy, another one of his brothers. Officer Salazar then proceeded to search Millard's black duffle bag. Although Officer Salazar found no contraband, Millard became "very nervous" during the search, shuffling back in forth. Millard kept touching his head and avoiding eye contact with Officer Salazar. Officer Salazar noticed an old, "beat up" stereo on the lower bunk bed. Millard became more nervous when Officer Salazar handled the stereo. His shuffling intensified, he fidgeted, looked side to side quickly, and touched his face. According to Officer Salazar, Millard got so nervous at one point he left the room to get a drink of water. Millard was unattended while he did this.

Officer Salazar decided to examine the stereo more closely. He saw tool marks

4

around the screws on the back of the stereo. The screws had scratches around them. Based on his training, Officer Salazar determined that the back "had been taken on and off quite a bit." He said to Millard "Have you ever opened this before? . . . This thing has been opened, take a look at it." He then asked, "Who's [sic] is this, is this yours?" Initially Lacy responded, "I bought it from a friend," but he soon changed his answer and said he merely borrowed it.

Officer Salazar tapped one of the stereo's speakers and heard a "clanking noise like something hitting the side on the inside of the speaker box" when he shook the speaker. He picked up the other speaker and could feel a difference between the two speakers. Officer Salazar peered into a gap in the back of the speaker and saw some grey material. He inserted a leatherman tool through the gap and tried to pull the material from the speaker. Something was wrapped inside the material which prevented Officer Salazar from removing it from the speaker. Officer Salazar poked his finger through the gap in the speaker and felt a "lumpy substance" wrapped in a grey cloth. He placed his nose near the gap and detected the odor of ether. Officer Salazar knew from his training and experience as an interdiction officer that the smell of ether indicated the presence of cocaine base.

By the time Officer Salazar discovered the substance in the speaker, Officer Teague had arrived. He stood in hallway with Officer Sanchez and Gregory Lacy when officer Salazar, spoke to Millard Lacy about the stereo. Officer Salazar said, "There's

5

something wrong with this. I don't feel comfortable, I don't feel comfortable with this." Officer Salazar told Millard, "[T]here's something in there like a ball or something inside where it won't come out. And I should have to break it, I should have to break it. You want to figure out what it is [?] Go ahead and break it open [?]" Millard replied, "Well, I don't want no one to mess up the radio, you know I want to listen to it." Officer Salazar acknowledged Millard's concern. At about the same time, Gregory Lacy chimed "Right", echoing Millard's concern that the radio remain operational. Officer Sanchez responded, "You have one speaker there I'd say just go ahead . . . break it open." Officers Salazar and Sanchez then looked at Millard and Millard nodded his assent to their breaking open the speaker. Officer Salazar used a pair of pliers to break off part of the back of the speaker. He extracted the grey cloth. It turned out to be a pair of boxer shorts wrapped around two packages containing 44.6 grams of crack cocaine. Extraction of the boxer shorts and cocaine did not affect the working order of the stereo. Moreover, the entire series of events, from initial contact to discovery of the cocaine base, took about fifteen minutes.

The agents arrested Millard and Gregory Lacy and took them into custody. Officer Sanchez conducted a strip search of Gregory Lacy at the DEA offices. As a routine part of the search, Officer Sanchez ordered Gregory to turn away from him and bend over. When Gregory did this, Sanchez discovered that Gregory had a package wedged between his buttocks. The package consisted of 34 packets which contained a total of 24 grams of

cocaine base. Gregory Lacy was processed and signed a fingerprint card and several other documents as "Michael B. Lacy."

Gregory and Millard Lacy each moved to suppress the cocaine the officers found. They claimed that the officers lacked probable cause to arrest them and that the search exceeded the scope of any consent. United States District Judge Bruce Black presided at a joint hearing on the Lacys' motion to suppress. Upon hearing the evidence, Judge Black found that while the dialogue of Millard's encounter was equivocal, he in fact consented to Officer Salazar's breaking open the back of the speaker so long as it did not keep the stereo from operating. Judge Black also found that there was probable cause to arrest Gregory since he traveled from a city that was a source for drugs, shared a room with someone engaged in drug trafficking, purchased a one-way ticket in cash, and attempted to conceal his identity.

Following Judge Black's ruling, Gregory and Millard Lacy proceeded to trial. The trial was by jury and Judge Warren Egington[1] presided. After closing arguments, the court gave the jury instructions but the instructions did not inform the jury that the weight of the cocaine base was an element of an offense under 21 U.S.C. § 841. Nevertheless, the jury convicted Millard. At sentencing, the court found that the preponderance of the evidence showed that Gregory and Millard Lacy were responsible not only for the cocaine

---

[1]  The Honorable Warren W. Egington, Senior United States District Judge for the District of Connecticut, sat by designation at Gregory Lacy's trial.

found on each of them individually, but for the cocaine possessed by the other as well. Thus, the court found Millard responsible for possessing 68.6 grams of cocaine and it sentenced him to 151 months in prison..

Millard timely appealed the District court's order. On appeal, he alleges that Officer Salazar illegally seized him; that his initial encounter with Officer Salazar—if it was consensual—became nonconsensual when Officer Salazar spoke for more than the "one second" he originally asked to speak to him; that the search of the compartment and luggage become unreasonable when Officers Sanchez and Teague appeared and asked him questions without obtaining his consent; that Officer Salazar exceeded the scope of consent when he searched the radio; that Officer Salazar exceeded the scope of consent when he damaged the radio; that the trial court committed plain error by failing to instruct the jury about determining the weight of the cocaine base and then sentencing him for cocaine that was discovered in Gregory Lacy's buttocks; that the trial court erred at sentencing when it found that he aided and abetted Gregory Lacy in possessing the 24 grams of cocaine base that Gregory concealed in his buttocks.

The Court exercises jurisdiction based on 28 U.S.C. § 1291. We affirm all the district court's judgments except the supervised release that it imposed.

## II. STANDARD OF REVIEW

The Court reviews the denial of a motion to suppress in the light most favorable to the prevailing party below (*i.e.* the government). See United States v. Pena, 143 F.3d

8

1363, 1368 (10ᵗʰ Cir. 1998). The Court must accept the trial court's factual findings unless they are clearly erroneous. See United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10ᵗʰ Cir.), cert. denied, 525 U.S. 978 (1998). Whether or not law enforcement had probable cause to arrest a defendant is a legal issue subject to *de novo* review. See United States v. Springfield, 196 F.3d 1180, 1182 (10ᵗʰ Cir. 1999), cert. denied, 529 U.S. 1029, 120 S.Ct. 1444, 146 L.Ed.2d 331 (2000).

### III. ANALYSIS

#### *Millard's Consent*

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical person have understood by the exchange between the officer and the suspect?" See Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 804, 114 L.Ed.2d 297 (1991). Here, the evidence shows that Officer Salazar asked Millard "[c]an I talk to you for a second" and that Millard said yes. The expressed object of Millard's consent was his agreement to speak with Officer Salazar. However, Millard argues that since he only consented to speak with Officer Salazar "for a second", any questioning beyond that time exceeded the scope of his consent and made the seizure unlawful. We disagree.

The phrase "for a second" is a colloquialism used to denote a brief but unspecific length of time. It does not mean one second and a typical person would understand this. When Millard agreed to speak with Officer Salazar for a second, he consented to a brief

9

conversation. The conversation between Millard and Officer Salazar, in fact, lasted just a few minutes. It plainly fell within the limits of Millard's consent and, thus, did not violate the Fourth Amendment. See United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) (a consensual search is not a seizure under the Fourth Amendment).

Additionally, Millard contends that he did not voluntarily consent to Officer Salazar's request to search his luggage because Officer Salazar's presence compelled his acquiescence and because Officer Salazar did not tell him that he could refuse to allow the search.. The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. See U.S. v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993) (citation omitted). The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given. See Id. Here, the government has shown that Officer Salazar was dressed in plain clothes, encountered Millard in a public place, did not brandish a gun, raise his voice, or threaten Millard in any way when he obtained Millard's consent to search the luggage. Although Officer Salazar did not inform Millard that he could refuse to consent to the search—a factor which courts can take into account when considering the voluntariness of a search—such an admonition is not required and its absence does not affect our resolution. See United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997) (police officer was not obligated to inform suspect that he was free to refuse consent to a search). The totality of

10

circumstances clearly establishes that Millard voluntarily consented to Officer Salazar's search.

### *The Search of Millard's Train Compartment and Luggage*

At the time Officers Sanchez and Teague arrived at Millard's compartment, Millard had already consented to a search. The presence of additional officers after a search has begun has no bearing on the validity of Millard's prior consent. At most, the "threatening presence of several officers" can become a relevant factor only with respect to whether a person feels free to terminate an encounter. See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). Officers Sanchez and Teague never entered Millard's compartment during the search. They stood outside, in plainclothes with no visible weapons. By all accounts, they spoke in conversational tones and even joked around. Thus, their presence cannot be considered "threatening" or seen as compelling Millard's cooperation. See Soto, 988 F.2d at 1557.

### *Officer Salazar's Search of the Radio*

An individual who consents to a search may limit the scope of his consent so long as he does so expressly and explicitly. See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995), cert. denied, 523 U.S. 1035 (1998). Once a party limits his consent, law enforcement officers must conduct their search in accordance with the party's terms in order for the search to remain consensual. See Id. In the instant case, Millard permitted Officer Salazar to examine the radio so long as Officer Salazar left the radio in working

11

order. Although Officer Salazar damaged the radio when he had to break off a small piece of the back of a speaker to extract the grey cloth that contained the crack cocaine, the radio remained in working order following the search. Thus, the trial court correctly held that Officer Salazar's search complied with the scope of Millard's consent.

### *Jury Instructions*

The jury convicted Millard of an offense under 21 U.S.C. § 841(b)(1)(C), but it did not determine how many grams of cocaine base Millard possessed because the trial court did not instruct the jury that weight was an element of the crime. Millard did not raise this issue at trial. Nevertheless, the Court can correct a trial court's error if it finds: (1) error; (2) that is "plain", "clear", or "obvious"; that (3) actually prejudiced the defendant by affecting his substantial rights. See Johnson v. United States, 520 U.S. 461, 465-467 (1997). The Court may exercise its discretion to notice an error not raised at trial if it finds the three conditions set forth above only if it also finds that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." See Id. at 466-67.

In light of Apprendi v. New Jersey, 530 U.S. 466, 488, 120 S.Ct. 2348, 2362, 147 L.Ed.2d 435 (2000), it is clear that the trial court should have instructed the jury to determine the weight of the cocaine Millard possessed. The government concedes that Millard can appeal this issue, but it argues that the failure to properly instruct the jury did not cause an error since Millard's sentence of 151 months is not "more severe than the

12

statutory maximum for the offense established by the jury's verdict" since the statutory maximum is 240 months.  See Apprendi, 530 U.S. at 488; see also, United States v. Aguato-Delgado, 220 F.3d 926 (8th Cir. 2000) (no error in jury instruction where defendant's sentence did not exceed statutory maximum proscribed by 21 U.S.C. § 841(b)(1)(C)); § 841(b)(1)(C).

The government is correct insofar as it argues that Millard's 151 month sentence does not implicate Apprendi.  Section 841(b)(1)(C) has a statutory maximum of 240 months and Millard's 151 month sentence is well under the maximum.  See § 841(b)(1)(C).  However, the district court also imposed a five year supervised release period.  Because Millard's sentence is less than twenty-five years but more than ten, it is a Class C felony.  See 18 U.S.C. § 3559(a)(3).  A Class C felony carries an authorized supervised release of "not more than three years".  See 18 U.S.C. § 3583(b)(2).  As such, the district court should have imposed a three year supervised release instead of the five year supervised release to which it sentenced Millard.

### *Aiding and Abetting*

The jury also found Millard guilty of aiding and abetting his brother Gregory in a plan to distribute the cocaine base that Gregory hid between his buttocks.  See 18 U.S.C. § 2.  At sentencing, the trial court attributed both the 44.6 grams of crack in the radio and the 24 grams of crack that Gregory hid to Millard.  Millard contends that the trial court erred when it attributed 68.6 grams of crack to him at sentencing.

13

The Court reviews "a sentencing court's determination of the quantity of drugs attributable to a defendant . . . for clear error. To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." See United States v. Morales, 108 F.3d 1213, 1225 (10th Cir. 1997)(internal citations omitted). In Millard's estimation, the trial court errantly sentenced him for aiding and abetting because the drugs found on Gregory were under Gregory's exclusive control. Furthermore, they were different in color, packaging and chemical composition than the cocaine in the radio. The trial court found these factors unconvincing and so do we.

We have specifically rejected the argument that one cannot be convicted of aiding and abetting the possession of a controlled substance unless the government proves possession. See U.S. v. Jackson, 213, F.3d, 1269, 1299 (10th Cir. 2000). A conviction may be obtained simply by establishing that a defendant gave "purposeful support to [the criminal] endeavor". See Id. Here, the evidence showed that Millard and Gregory Lacy were brothers who traveled together and reserved and paid for their single room together. When Gregory tried to conceal his identity by passing himself off as Michael Lacy, Millard lied on Gregory's behalf. These facts and the timing of the events show by a preponderance of the evidence that Millard undertook acts in furtherance of Gregory's drug trafficking. This is sufficient to establish Millard's responsibility for the drugs found

14

on Gregory's person.  See Id.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM Millard Lacy's conviction and the 151 month sentence that the district court imposed.  We VACATE the five year supervised release and REMAND for resentencing consistent with the Court's opinion.


Entered for the Court


Richard Mills
United States District Judge